Joseph MARTINEZ, et al., Plaintiffs,

v.

**RHODE ISLAND HOUSING AND MORTGAGE FINANCE CORP., et al., Defendants.**

Civ. A. No. 83–0319–S.

United States District Court,
D. Rhode Island.

Feb. 13, 1986.

Rhode Island Legal Services, John W. Dineen, Michael V. Milito, Providence, R.I., for plaintiffs.

Edwards & Angell, William P. Robinson, III, Jeffrey S. Schreck, Michael DeBiase, Providence, R.I., for defendant R.I.H.M. F.C.

Susan Riley, Sheila Luber, and Arthur Goldberg, Attys., Civ. Div., U.S. Dept. of Justice, Howard Schmeltzer, Steve Goldstein, Suzanne Curt, Attys., Dept. of Housing & Urban Development, Washington, D.C., Lincoln C. Almond, U.S. Atty., Everett C. Sammartino, Ass't U.S. Atty., Providence, R.I., for defendant, Pierce.

## MEMORANDUM AND ORDER

SELYA, District Judge.

This case, in its current posture, presents a question regarding the entitlement of the plaintiffs, a class of "very low-income" present and future applicants for federally funded low-income housing in Rhode Island, to recover counsel fees under 28 U.S.C. § 2412(d)(1)(A), a central provision of the Equal Access to Justice Act (EAJA). At the times material hereto,[1] the statute intoned in pertinent part that:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, ... incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the

---

1. Subsection (d) of § 2412 was repealed on October 1, 1984, subject to the proviso that it would continue to apply through final disposition of any action theretofore commenced. *See United States v. Yoffe,* 775 F.2d 447, 448 n. 1 (1st Cir.1985); *Vascera v. Heckler,* 624 F.Supp. 1198 n. 1 (D.R.I.1986). Inasmuch as this action was begun in 1983 and was pending on the merits on October 1, 1984, it slips neatly within the integument of the savings clause. In any event, on August 5, 1985, the President signed P.L. 99–80, 99 Stat. 183 (1985) (hereinafter "1985 Reenactment"), which as a practical matter reenacted, extended, and amended § 2412(d).

position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A) (1982).

### I.

This suit was originally brought on May 13, 1983 by the plaintiffs against a state housing authority, Rhode Island Housing and Mortgage Finance Corporation (RIHMFC). The dimensions of the plaintiffs' initiative against RIHMFC are spelled out in the First Circuit's affirmance of a preliminary injunction issued by this court against RIMHFC, *see Martinez v. RIHMFC,* 738 F.2d 21 (1st Cir.1984) (*Martinez I*), and it would serve no useful purpose to repastinate that tired ground in this rescript. For present purposes, it suffices to say that, on October 6, 1983, this court granted the plaintiffs' motion for leave to file a second amended complaint adding Samuel Pierce, in his capacity as Secretary of the federal Department of Housing and Urban Development,[2] as a party defendant. The Secretary had not been served when the preliminary injunction against RIHMFC was entered, and HUD did not participate in the ensuing journey to the court of appeals. *See Martinez I,* 738 F.2d at 26.

The redress which the plaintiffs sought against the Secretary was narrow: in their second amended complaint, they urged the court to "order preliminary and permanent injunctive relief requiring the Secretary to immediately implement 42 U.S.C. § 1437n" either by interim or final regulation, or in the alternative, to enter a declaration that § 1437n was self-implementing. Section 1437n, it should be noted, was enacted as part of the Omnibus Budget Reconciliation Act of 1981 (OBRA), Pub.L. 97–35, § 322 et seq., 95 Stat. 357, 400. It contemplated an October 1, 1981 effective date. *Id.* (The reader is referred to *Martinez I* for a concise explication of the terms of § 1437n and how it impacted the existing statutory

scheme and the regulations. 738 F.2d at 23–26.) In brief, inasmuch as the provisions of § 1437n were not self-executing,[3] it was necessary for the Secretary to promulgate regulations in order to work the congressional will, and the plaintiffs, irked at what they perceived to be the Secretary's tardiness in doing so, sought to force the emergence of such regulations. That task was at all times the plaintiffs' litigation objective vis-a-vis the federal defendant.

Shortly after the filing of the second amended complaint, the plaintiffs moved for a mandatory injunction against the Secretary to bring about promulgation of the regulations. That motion was denied on November 23, 1983. It was renewed on January 5, 1984 and again denied in an *ore tenus* bench decision. An order was entered on March 16, 1984. The plaintiffs filed a third amended complaint on March 28 (which did not alter the scope of the relief that they sought to derive from HUD) and thereafter resurrected their motion for preliminary injunction in mid-April. It was again rebuffed, and a further order was entered on May 15, 1985. (In the interim, the regulations had been forwarded by HUD to the Federal Register on May 4, 1984 and took effect in the ordinary course.)

The federal defendant, discerning that the case had become moot as to Pierce, thereafter moved to dismiss the third amended complaint. This motion was granted on June 26, 1984. The plaintiffs' motion for leave to file a supplemental (fourth) complaint was denied. The plaintiffs moved for reconsideration of these orders, and the court held the federal defendant in the case pending reconsideration.

Protracted settlement negotiations between the plaintiffs and RIHMFC then ensued, a series of conferences and meetings was held (in many of which the district

---

**2.** For ease in reference, Pierce will be sometimes referred to as the "Secretary" and the department will be called "HUD".

**3.** This court so held prior to HUD's joinder in the case, and the First Circuit concurred. *Martinez I,* 738 F.2d at 25.

judge participated), and courtroom matters drifted until a settlement was confirmed by the court on November 22, 1985. (HUD was not a party to, nor bound by the terms of, the negotiated settlement.) The plaintiffs then moved to discontinue their action against the Secretary, without prejudice. *See* Fed.R.Civ.P. 41(a)(2). An order to that effect was entered on December 4, 1985. All claims implicating RIHMFC have now been adjusted amicably between that agency and the plaintiffs. (The settlement included payment of counsel fees to the plaintiffs for work anent the RIHMFC furculum of the suit. *See* 42 U.S.C. § 1988.) These developments coalesced to leave the instant EAJA application as the sole remaining matter before the court. The conflicting contentions of the parties as to EAJA entitlement *vel non* have been amplificatively briefed and earnestly argued. Decision having been reserved, this memorandum comprises the court's findings and conclusions in respect to the same.

## II.

■ 28 U.S.C. § 2412(d)(1)(A), quoted *ante*, requires as conditions precedent to fee shifting eligibility *both* that the private suitor prevail and that the federal government's position lack substantial justification. *E.g., Brown v. Secretary of Health and Human Services,* 747 F.2d 878, 882 (3d Cir.1984); *Vascera,* at 1201–02.[4] The threshold issue in this case, therefore, is whether or not the plaintiffs can be said to have been prevailing parties vis-a-vis the federal defendant.

■ The test of prevailing party status under the EAJA is functionally equivalent to that under other federal fee shifting statutes. *E.g., Cervantez v. Whitfield,* 776 F.2d 556, 562 (5th Cir.1985) (same standards applicable to EAJA as to Title VII, 42 U.S.C. § 2000e–5(k)). *See generally Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40

(1983); *Premachandra v. Mitts,* 727 F.2d 717, 720 (8th Cir.1984) ("the term ['prevailing party' as employed in EAJA] is to be read consistently with its use in other fee shifting statutes"); H.R.Rep. No. 96–1418, 96th Cong., 2d Sess. 11 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 4953, 4984, 4990. *Cf. Segal v. Gilbert Color Systems, Inc.,* 746 F.2d 78, 85–86 (1st Cir. 1984) (same methods of computing lodestar apply to all federal fee shifting statutes).

It is plain that plaintiffs may prevail in the EAJA sense well short of the entry of final judgment in their favor. The First Circuit, in a widely recognized opinion, has adopted a biaxial modality for determining prevailing party status. Plaintiffs will be considered to have prevailed *either* (i) if "they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit," *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978), *or* (ii) if they obtain relief from without the courtroom, so long as their suit was not groundless and, conversely, was a "necessary and important factor in achieving the improvements." *Id.* at 281. (This second axle of *Nadeau* is sometimes referred to as the "catalyst" theory of recovery.) The court of appeals has left no doubt that, *"Nadeau's* two tests are separate and distinct: satisfying either of them is sufficient to categorize a party as 'prevailing'." *Coalition for Basic Human Needs v. King,* 691 F.2d 597, 599 (1st Cir.1982).

In this instance, the plaintiffs cannot qualify for the largesse of the EAJA under the first prong of *Nadeau.* Though they achieved substantial success against RIHMFC (for which their counsel fees and costs have been satisfied, *see* text *ante*), they were abysmally unsuccessful in their efforts against HUD. They secured no injunctive relief, they obtained no declaratory relief, they opposed the federal defendant's motion to dismiss to no avail, and they ultimately discontinued their action.

---

**4.** The 1985 Reenactment made it clear that both the prelitigation position of the agency and the litigation position of the government are to be considered in the court's assessment of the "substantial justification" fascicle. *See* § 2412(d)(1)(B), as amended by the 1985 Reenactment, § 2(c)(2)(B). *See also Yoffe,* 775 F.2d at 449.

In fine, they lost every round on points until the Secretary ultimately delivered the knock-out punch. (It matters not at all whether one views the end of the plaintiffs' unavailing match with HUD as being the court's granting of the Secretary's motion to dismiss or the plaintiffs' voluntary discontinuance of the action.) The plaintiffs won no judicial victory—much less a significant or substantial one—against the federal defendant. And, in passing upon an EAJA application, the plaintiffs' success (or lack thereof) is measured vis-a-vis the federal defendant alone. *E.g., Cervantez*, 776 F.2d at 562. The fact that their claims against the state defendant prospered is immaterial. Thus, if the plaintiffs deserve a fee award under EAJA, it must be because they meet the requirements of the catalyst theory.

### III.

A reasoned approach to *Nadeau's* second axle is necessarily fact-intensive and case-specific. The chronological sequence of events is "an important, although clearly not definitive factor, in determining whether or not defendant can be reasonably inferred to have guided his actions in response to plaintiff's lawsuit." *Nadeau*, 581 F.2d at 281. *See also Ortiz de Arroyo v. Barcelo*, 765 F.2d 275, 282 (1st Cir.1985). In this case, the proof of the catalyst pudding lies in the record. So, the court commences its trek through the nisi prius roll.

The OBRA amendments were signed into law on August 13, 1981. As previously noted, the Congress, perhaps with collective tongue in cheek given the inescapable need for implementing regulations, set October 1, 1981 as the effective date for purposes of § 1437n. When this suit was commenced against RIHMFC in May of 1983, the anticipated regulations had not been published. Before the Secretary was added as a party, this court, without the benefit of any explanation of the gap, remarked that the delay seemed to indicate "rather inexcusable foot-dragging in the promulgation of an administrative scheme." The court's doubts on that score were, however, soon dispelled; once the Secretary appeared in the case on October 21, 1983, the mystery was unravelled. (There is, as this case amply illustrates, considerable force to the hoary adage that "there are two sides to every story," and the court had, prior to HUD's joinder in the action, been exposed only to a singularly biased account propagated (unwittingly) by the plaintiffs and not disclaimed by RIHMFC.)

In response to the plaintiffs' repeated (unavailing) efforts to gain injunctive relief, the Secretary, over time, filed a series of five declarations detailing his actions, viz., Declaration of John J. Knapp, General Counsel of HUD, November 10, 1983 (*Knapp I*); Declaration of Mr. Knapp, January 17, 1984 (*Knapp II*); Declaration of Grady Norris, Assistant General Counsel of HUD, February 16, 1984 (*Norris I*); Declaration of Mr. Knapp, March 9, 1984 (*Knapp III*); Declaration of Mr. Norris, May 7, 1984 (*Norris II*). (All are attached as appendices to this memorandum.) These declarations indicate beyond any serious question that the Secretary began making reasonably diligent efforts to meet his regulatory responsibilities under OBRA soon after its enactment.

Those labors resulted in the publication of an interim rule on May 4, 1982 and the subsequent publication (on December 29, 1982) of a proposed regulation. Public comments were solicited, to be submitted no later than February 28, 1983. The value of soliciting citizen reaction in a context such as this can hardly be overstated. "Public comment contributes importantly to self-governance and helps ensure that administrative agencies will consider all relevant factors before acting." *Levesque v. Block*, 723 F.2d 175, 187 (1st Cir.1983). Indeed, there is no equivalent surrogate for a procedure which allows interested persons to make their views known to the Secretary in time to influence the drafting of the regulation in a meaningful way. Courts have long recognized the "psychological and bureaucratic realities" which counsel in favor of notice-and-comment rulemaking. *See New Jersey v. United*

*States EPA*, 626 F.2d 1038, 1049 (D.C.Cir. 1980). Congress has done the same. *See* 5 U.S.C. § 553. So, it comes with peculiarly ill grace to attempt to denigrate HUD, in this instance, for taking the time and trouble to invite outside suggestions.

Over 1300 such comments were received. After internal analysis and coordination, a draft final rule was completed on September 13, 1983 and promptly transmitted, as legally required, to the Office of Management and Budget (OMB). *See* Executive Order 12291. (There was, understandably, great uncertainty at the agency level during much of 1983, if not earlier, as it then appeared reasonably likely that Congress would significantly alter § 1437n. *See Knapp I* at 1004.) Though it is at least arguable that HUD could have moved faster before the end of calendar 1982, it is exceedingly difficult to fault the timeliness of HUD's endeavors during the first nine months of calendar 1983.

During the period when OMB had the September 13, 1983 proposal under advisement, HUD rethought its position and began work on modifications of the proposed final rule.[5] On November 17, 1983, HUD's presentiments materialized: Congress passed the Housing and Urban-Rural Recovery Act of 1983, Pub.L. 98–181, 97 Stat. 1155 (HURRA), amending the pertinent sections of OBRA and necessitating alterations in the proposed regulation. *See Knapp II.*

A new round of internal analysis began. Fresh drafts of the proposed final regulations were submitted by HUD to OMB prior to February 16, 1984. *See Norris I.* OMB review was completed by March 9, 1984, but HUD descried the need for additional revisions "to add transition provisions [to] permit an earlier effective date." *Knapp III* at 1006. That decision appears

in retrospect to have been a reasonable one. HUD targeted a date of March 26, 1984 for transmittal to the Federal Register. *Id.* That prognostication proved to be overly optimistic; transmittal occurred on May 4, 1984 and publication followed apace. *See* 49 Fed.Reg. 19926 (May 10, 1984), codified at 24 C.F.R. Part 813. There is nothing to suggest that the agency did not have its nose to the grindstone during this period.

It is well to note, too, that the so-called § 8 program, *see* 42 U.S.C. § 1437f(b)(2) (repealed), in which the plaintiffs were interested, was but one of several programs for which the Secretary had to assume regulatory responsibility under the OBRA amendments and the HURRA. Virtually simultaneous with the regulations here sub judice, the Secretary issued final regulations implementing 42 U.S.C. § 1437n for the public housing program and the Indian housing program. *See* 49 Fed.Reg. 21476 (May 21, 1984), codified at 24 C.F.R. Part 913. This confluence of responsibilities itself (justifiably) accounted for some of the time expended in the rulemaking process.

As this chronology plainly reveals, HUD acted by and large in an assiduous, diligent, and expeditious fashion. The only area where greater celerity could reasonably have been expected was in the early stages after the enactment of OBRA, that is, before the publication of a proposed regulation on December 29, 1982. From that time forward, HUD acted with commendable dispatch. (Indeed, plaintiffs' counsel conceded at oral argument on this motion that "since the filing of the law suit ... HUD has not act[ed] unreasonably.") And, the Secretary's pace did not quicken perceptibly—or even change—from and after the initiation of the instant action. The first version of the proposed final regula-

---

**5.** This process took place principally in September and October of 1983. *See Knapp I* at 1003–1004. Time was not a critical factor at this juncture, inasmuch as 42 U.S.C. § 3535(*o*) required that when a HUD regulation is to be published as effective, the effective date of the regulation must be deferred until the expiration of the first period of thirty calendar days of continuous

session of Congress following such publication. Congress was scheduled to adjourn for the remainder of the calendar year on November 18, 1983, so there could not be thirty continuous session days before the end of 1983, at any time after mid-October. Congress did not return to session until late January of 1984.

tion was submitted by HUD to OMB some three weeks *before* these plaintiffs amended their complaint to join the Secretary as a party defendant, and more than five weeks *before* HUD initially appeared in this action.

On the prevailing party prong of the EAJA test, the plaintiffs can derive no solace from any agency lassitude during 1981–1982. Their suit was, in that early epoch, not even a gleam in their counsel's eye. Certainly, the instant action, brought in mid-1983, could not have been a catalyst for the start of a steady, uninterrupted march which began no later than the final months of 1982. Any argument to the contrary confuses the standards for ascertaining prevailing party status with those for determining substantial justification. *See Brown,* 747 F.2d at 882; *Vascera,* at 1202. This court again "eschews the temptation to impart any such synthetic imbrication to the dual requirements of the EAJA." *Id.,* at 1201–02.

The petitioners harp on the fact that, in the aftermath of the successive preliminary injunction hearings (at each of which HUD prevailed), the Secretary sometimes failed to meet self-imposed (projected) deadlines. *E.g.,* Plaintiffs' Brief at 12. But, this asseveration simply will not carry the weight assigned to it. ·Projections are, after all, projections—and are, almost by definition, bound to be somewhat imprecise. The law does not require a federal defendant to be Delphic. What is more, any such miscalculations were fribbling in nature and extent. Even with the 20/20 vision of hindsight, the self-imposed deadlines appear to have been reasonable estimations, and the failure to meet some of them exactly in no way detracts from the overall perception of the Secretary's diligence. What is more,

the fact that some such deadlines were allowed to go by the boards suggests that HUD was concerned with doing its job properly, not with the spectre of this suit.

There is no probative evidence whatever [6] that the instant litigation galvanized HUD into motion or triggered a series of events leading to the establishment (or the more expeditious establishment) of a regulatory format. There is no basis for drawing the nexus inference which the petitioners suggest. The requisite causal connection between the suit and the governmental action is, on this record, wholly lacking. The chronology unerringly proves this out, even when due allowance is made for the fact that "the evidence relevant to the causes of defendant's behavior is under defendant's control and not easily available to plaintiff." *Nadeau,* 581 F.2d at 281.

These plaintiffs were not a causative agent in the adoption of the regulations (or in any meaningful acceleration of the adoption process); they were not even gadflies, stimulating or provoking the Secretary to unwonted activity. The mere existence of a temporal coincidence—that this case was pending during a portion of the time that administrative deliberations were underway and at the same time that those deliberations bore fruit—cannot alone suffice to cloak the petitioners in catalytic rainment. And, they have offered nothing more.

This court is persuaded beyond any plausible doubt that the administrative processes at HUD and at OMB ran their course unaffected by the pendency of this lawsuit. The court finds that the petitioners gained nothing of consequence from the institution and maintenance of the complaint against HUD.

---

**6.** The petitioners lament their inability to secure document production from HUD in order further to buttress their fees claim. *E.g.,* Plaintiffs' Brief at 14–15. The argument is disingenous. In the first place, the plaintiffs never sought such discovery in connection with their fees application, but at a substantially earlier time in the litigation and for an altogether different purpose. Secondly, there is scant reason to believe that the Secretary's invocation of the

deliberative process privilege was unfounded. Lastly and most importantly, substantial justification "shall be determined on the basis of the record ... which is made in the civil action for which fees ... are sought." 28 U.S.C. § 2412(d)(1)(B), as amended by the 1985 Reenactment, § 2(c)(2)(B). Fees applications cannot evolve into full blown satellite litigation if any semblance of order and proportionality is to be maintained.

A suit need not be the sole cause of a defendant's actions to be properly regarded as a catalyst, *Nadeau*, 481 F.2d at 281, but it must be a competent producing cause of those actions in at least some measurable degree. This litigation was no factor at all—much less a "necessary and important factor," *id.*—in achieving the promulgation of final regulations or in advancing the date when those regulations took effect. The final rules would, in the court's view, have ensued in the same approximate time frame whether or not these plaintiffs had taken up the cudgels. Their suit, to all intents and purposes, was "completely superfluous." *Id.*

### IV.

This court recognizes the wisdom—and the applicability, by analogy, here—of the statement that " 'victory' in a civil rights suit is typically a practical, rather than a strictly legal matter." *Aubin v. Fudala*, 782 F.2d 287, 291 (1st Cir.1986). Surely, the mere lack of judicial involvement in the promulgation of the regulations is not determinative. After all, the regulations were eventually issued. But, although the petitioners' position improved in this sense, neither they nor their counsel played any meaningful part in achieving this improvement. Thus, notwithstanding the amelioration which coincidentally occurred, they do not enjoy prevailing party status under the catalyst theory or otherwise, and their ef-

fort to dip into the EAJA honeypot must come to naught.

These findings and conclusions render it unnecessary to reach the remaining questions raised by the parties, *e.g.*, whether the suit was from the start "frivolous, unreasonable, or groundless," *Nadeau*, 581 F.2d at 281 (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 700–01, 54 L.Ed.2d 648 (1978)),[7] whether HUD's behavior was "substantially justified,"[8] whether "special circumstances" existed which would render a fee award unjust, 28 U.S.C. § 2412(d)(1)(A), and whether the claim for fees is overblown.

For the reasons described above, the plaintiffs do not enjoy prevailing party status within the EAJA realm. The application for an award of fees and costs against the Secretary under 28 U.S.C. § 2412(d)(1)(A) must be, and it hereby is, denied.

*So ordered.*

### APPENDIX A (KNAPP I)

### DECLARATION OF JOHN J. KNAPP

I, JOHN J. KNAPP declare and state:

1. I am the General Counsel of the United States Department of Housing and Urban Development (HUD). In this capacity I am responsible for providing the Secretary of HUD and HUD officials with legal

---

7. The Secretary argues at this juncture, as he did throughout the pendency of the case, that the timing of the promulgation of regulations rests essentially in the agency's discretion. This position is not without some support in the authorities. *E.g., SEC v. Chenery Corp.*, 332 U.S. 194, 201–04, 67 S.Ct. 1575, 1579–81, 91 L.Ed. 1995 (1946). *But see Sierra Club v. Gorsuch*, 715 F.2d 653, 659 (D.C.Cir.1983) ("Judicial review of decisions not to regulate must not be frustrated by blind acceptance of an agency's claim that a decision is still under study.") (footnote omitted). In view of the resolution of the applicants' fees petition on other grounds, however, the court need not enter this tangled administrative law thicket.

8. There is nevertheless much to be said for HUD's deliberate approach to the problem. As Ecclesiastes 9:11 teaches, "the race is not [always] to the swift." The precise way in which

§ 1437n was to be rendered operational was of great import to state and local governments, to thousands of developers, and to hundreds of thousands of affected families. This element of importance is perhaps underscored by the fact that Rhode Island Legal Services felt that it was necessary to cross swords with HUD in this litigation. Moreover, § 1437n could not be implemented in a vacuum: §§ 322 and 323 of the OBRA interlocked, thereby complicating the matter from a regulatory viewpoint.

In considering the totality of the circumstances present in this situation, visions of tortoises and hares spring readily to mind. There is nothing to be gained in an organized society by imposing a requirement that the federal government constantly move at breakneck speed. Time is essential to reasoned decision-making, especially where the stakes are potentially high.

advice and other assistance on the development and issuance of regulations.

2. Based on my personal knowledge and information contained in records of the Office of General Counsel, described below is a chronology of Departmental action taken to publish the final regulations implementing, *inter alia*, the provisions of Section 323 of the Omnibus Budget Reconciliation Act of 1981 (OBRA), which deal with income limits on the selection of tenants for public housing and Section 8 units.

3. After the passage of OBRA, HUD's Office of Housing suggested that a regulation implementing Sections 322 and 323 of OBRA should be published as an interim rule. The determination as to whether a regulation appropriately can be issued without prior comment is a legal determination, based upon 24 C.F.R. Part 10, and is therefore my responsibility. After reviewing the Office of Housing's position, I decided that it would be appropriate to publish as an interim rule only a regulation which implemented the statutory changes in the percentage of income to be paid by tenants in the public housing and Section 8 programs because the implementation of those changes would flow directly from the statute's requirements without any appreciable exercise of HUD's discretion. That interim rule was published on May 4, 1982. I determined on the other hand that regulations implementing the remainder of the OBRA statutory changes, including 42 U.S.C. § 1437n, should be published as a proposed rule because those changes included matters permitting an exercise of broad Secretarial discretion to the extent that the receipt and consideration of public comments was necessary.

4. On December 29, 1982, HUD published a proposed regulation which would add a new Part 813 to Title 24 of the Code of Federal Regulations (Part 813). This proposed rule contained provisions regarding: (1) changes in the calculation of income and adjusted income for the purposes of determining eligibility and the amount of contribution toward rent a tenant must pay; (2) phase-in of increased contribution require-

ments for tenants in occupancy; and (3) applicability of restrictions on leasing of dwelling units to families other than very low income families. As such, it would have implemented various provisions of Sections 322 and 323 of OBRA. Public comments on the regulation were due on February 28, 1983.

5. HUD received over 1300 public comments on Part 813, many of which raised significant issues concerning HUD's implementation of the changes required by OBRA. These comments were summarized and analyzed by lawyers in the Office of Regulations, who are now responsible for drafting regulations at HUD.

6. On April 13, 1983, the Office of Regulations submitted its analysis of the public comments to the Assistant Secretary for Housing, who was responsible for making decisions on the contents of the regulation.

7. After the public comment summary was submitted to the Assistant Secretary for Housing, it was circulated among the divisions of the Office of Housing affected by the rule for their consideration. Numerous discussions occurred between officials from HUD's Office of Housing, HUD's Office of Policy Development and Research, the Office of Management and Budget (OMB), myself and my staff to evaluate the many concerns raised by the public comments. Final meetings to resolve these concerns took place on August 11, 15 and 29, 1983.

8. After the August 29, 1983 meeting, the Office of Regulations began to draft a final rule which would take into consideration the public comments. This draft was completed on September 13, 1983, and included major revisions in the proposed rule, as well as a preamble which discusses the issues raised by the public comments.

9. On September 15, 1983, that draft was submitted to OMB for its review pursuant to the requirements of Executive Order 12291. On September 26, 1983, OMB extended its review period indefinitely.

10. On September 19, 1983, the Office of Regulations met with personnel from

the Office of Housing as well as with me to consider the draft given to the Office of Housing on September 13, 1983.

11. After several follow-up meetings with Housing staff, the Office of Regulations developed a new draft of Part 813 on October 31, 1983, which was submitted for review to myself, the Assistant Secretary for Housing, and to the new Assistant Secretary for Public and Indian Housing, who is now also responsible for some of the programs affected by Part 813.

12. There remain some additional problems which must be resolved before a final regulation is ready for publication. However, I do not anticipate that those changes will take a significant amount of time to complete. I expect that OMB review will be concluded and that the regulation will be ready to be sent to Congress as a final rule by December 30, 1983.

13. Section 7(o) of the Department of HUD Act, 42 U.S.C. § 3535(o), requires that when a regulation is to be published as effective, the effective date of the regulation must be deferred until the expiration of the first period of 30 calendar days of continuous session of Congress following such publication.

14. As of November 9, 1983, there will not be 30 continuous session days before the end of 1983 because Congress has scheduled to adjourn for the remainder of the calendar year on November 18, 1983. Although Congress has not yet scheduled a date on which it will reconvene in 1984, it is likely it will reconvene sometime during the latter part of January. Therefore, even if Part 813 were sent to Congress for review immediately, the earliest possible date on which the rule could become effective would be sometime in February or March of 1984.

15. I also wish to advise the court that the publication schedule and/or the content of Part 813 could change if Congress passes legislation amending the statutes on which the rule is based. On July 13, 1983, the House of Representatives passed a housing authorization bill which would, *inter alia*, repeal Section 323 of OBRA and make significant changes to Section 322. The portions of that bill that would repeal Section 323 are attached hereto. Efforts in the Senate and House to agree on a housing authorization bill for passage before adjournment are currently underway. If such legislation is passed before the close of the current session and signed by the President, it is likely that significant changes would have to be made in Part 813 before it could be promulgated by HUD.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 10, 1983.

/s/ John J. Knapp
JOHN J. KNAPP
General Counsel
Department of Housing
and Urban Development
Washington, D.C.

## APPENDIX B (KNAPP II)

### DECLARATION OF JOHN J. KNAPP

I, JOHN J. KNAPP declare and state:

1. This declaration supplements the information contained in my declaration of November 10, 1983 on the steps HUD has taken to publish regulations implementing provisions of Section 323 of the Omnibus Budget Reconciliation Act of 1981 ("OBRA"). The information contained in this affidavit is based on personal knowledge and information provided to me by my staff.

2. On November 17, 1983 Congress passed the Housing and Urban-Rural Recovery Act of 1983, ("the 1983 Act"), which was signed into law by the President on November 30, 1983.

3. The 1983 Act made several amendments to Sections 322 and 323 of OBRA which required changes in the draft of HUD's regulations which will implement Sections 322 and 323 of the 1981 Act.

4. These amendments included a change in the percentage of low-income persons other than very low-income persons to be admitted to public housing and Section 8

units which were available for occupancy prior to October 1, 1981. In addition, changes in the definition of "adjusted income" (which is used in determining how much rent a tenant must pay), and an expanded application of the 10% annual limit on rent increases contained in OBRA required the drafting of new provisions in the regulations.

5. The Office of Regulations began its analysis of the new statute to determine what changes or additions would have to be made to the draft regulations referred to in my earlier statement immediately after final action by the Congress and before the signing of the bill by the President. This process included consultation with HUD program offices directly involved (the Office of Housing and the Office of Public and Indian Housing) and with the Farmer's Home Administration (regarding the implementation of Section 206(d)(3) of the 1983 Act, which establishes an annual limit on rent increases for tenants who reside in Farmer's Home assisted units and whose subsidies will be converted to Section 8 assistance administered by HUD). As a result of this early action, a draft of final rules incorporating all of the changes required by the 1983 Act was placed into full departmental clearance approximately two weeks after the 1983 Act was signed by the President. This clearance process involved review of the rules by fourteen departmental offices. The draft regulations consist of two separate rules, one governing units administered by the Office of Housing, the other governing units administered by the Office of Public and Indian Housing, and together (with preambles) comprise approximately 140 typewritten pages.

6. Several important issues regarding implementation of the statutes have been raised in the clearance process and remain to be resolved. This includes questions regarding implementation of Section 323 of OBRA, as amended, specifically, grounds on which requests for admission to projects, or issuance of Section 8 certificates, for low-income persons other than very low-income persons will be considered. I have been involved personally in the resolution of these questions and expect to continue to be until the regulations are completed. I expect that a final version of the regulations will be ready to be sent to the Office of Management and Budget, pursuant to Executive Order 12291, by February 15, 1984.

7. I also want to advise the Court that the Department does not foresee a need at the present time to restrict by regulation Section 8 owners' or public housing agencies' tenant admission practices to ensure that 75% of the new tenants of projects which first became available for occupancy before October 1981 are very low-income families. According to information furnished to HUD's Office of Policy Development and Research, the percentage on a national basis of very low-income families moving into Section 8 and public housing has, from 1974 to 1982, exceeded the 75% rate now required by the 1983 Act.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 17, 1984

/s/ John J. Knapp
JOHN J. KNAPP
General Counsel

## APPENDIX C (NORRIS I)

### Declaration of Grady Norris

I, Grady Norris, do hereby declare and state:

1. I am the Assistant General Counsel for Regulations at the Department of Housing and Urban Development. In this capacity, I am familiar with the steps HUD has taken to promulgate regulations implementing section 323 of the Omnibus Budget Reconciliation Act of 1981 (OBRA) and Section 213 of the Housing and Urban Rural Recovery Act of 1983.

2. The purpose of this affidavit is to inform the Court that draft final regulations implementing these provisions for the Section 8 and public housing programs have been sent to OMB where they are undergoing review.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 16th, 1984.

/s/ Grady Norris
Grady Norris
Assistant General Counsel
for Regulations

## APPENDIX D (KNAPP III)

### DECLARATION OF JOHN J. KNAPP

I, JOHN J. KNAPP declare and state:

1. This declaration supplements the information contained in my previous declarations concerning the steps HUD has taken to publish regulations which, *inter alia,* implement Section 323 of the Omnibus Budget Reconciliation Act of 1981 ("OBRA") and Section 213 of the Housing and Urban Rural Recovery Act of 1983. The information contained in this affidavit is based on personal knowledge and information provided to me by my staff.

2. The process of Office of Management and Budget review required by Executive Order 12291 has been completed. However, the Department is now completing several additional revisions in the rules before transmittal to the Federal Register. The purpose of these additional revisions is to add transition provisions which will permit an earlier effective date for the benefits of this rule than that contemplated by the version approved earlier by OMB. I expect this process to be completed promptly and that the final regulations will be transmitted on or about March 26, 1984 to the *Federal Register* for publication.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 9, 1984.

/s/ John J. Knapp
JOHN J. KNAPP
General Counsel
Department of Housing
and Urban Development
Washington, D.C. 20410

## APPENDIX E (NORRIS II)
### *Declaration of Grady Norris*

I, Grady Norris, do hereby declare and state:

1. I am the Assistant General Counsel for Regulations at the Department of Housing and Urban Development. In this capacity, I am familiar with the steps HUD has taken to promulgate regulations implementing section 323 of the Omnibus Budget Reconciliation Act of 1981 (OBRA) and Section 213 of the Housing and Urban Rural Recovery Act of 1983.

2. The purpose of this affidavit is to inform the Court that HUD is issuing the final regulation implementing these provisions for the Section 8 program. The regulation was delivered to the Federal Register for publication on Friday, May 4, 1984, and I expect that it will be published by Friday, May 11, 1984.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 7, 1984.

/s/ Grady Norris
Grady Norris
Assistant General Counsel
for Regulations

## APPENDIX F

# Calendar No. 307

**98TH CONGRESS**
**1ST SESSION**

# H.R. 1

## IN THE SENATE OF THE UNITED STATES

JULY 20 (legislative day, JULY 18), 1983
Received; placed on the calendar

# AN ACT

To amend and extend certain Federal laws that establish housing and community and neighborhood development and preservation programs, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### SHORT TITLE AND TABLE OF CONTENTS

SECTION 1. This Act may be cited as the "Housing and Urban-Rural Recovery Act of 1983".

### TABLE OF CONTENTS

Sec. 1. Short title and table of contents.
Sec. 2. Findings and purpose.

\* \* \*

tenants, which recommendations shall be developed in consultation with public housing agencies.".

(b) Section 9 of the United States Housing Act of 1937 is amended by striking out subsection (d).

(c) For purposes of determining the amount of payments to be made during fiscal year 1983 under section 9 of the United States Housing Act of 1937, the rule of the Department of Housing and Urban Development entitled "Gross Rent—Public Housing Program", published on May 4, 1982 (47 Federal Register 19120), may not be considered to have been effective before February 15, 1983, with respect to any public housing agency that was, before the beginning of such fiscal year, a party to a civil action to enjoin implementation of such rule.

## INCOME ELIGIBILITY

SEC. 212. (a) The United States Housing Act of 1937 is amended by striking out section 16.

(b) Section 8(c) of such Act is amended by adding the following new paragraph at the end thereof:

"(9) At least 30 percent of the families assisted under this section with annual allocations of contract authority shall be very low-income families at the time of the initial renting of dwelling units.".