**Ron PATTON et al., Plaintiffs-Appellees,**

v.

**Carl ARCHER, Defendant-Appellant.**

**No. 77-1381.**

United States Court of Appeals,
Fifth Circuit.

March 7, 1979.

Rehearing Denied April 2, 1979.

---

1320

James P. Linn, Bernard J. Rothbaum, Jr., Oklahoma City, Okl., for defendant-appellant.

Robert D. Lemon, Robert D. McCutcheon, Perryton, Tex., for plaintiffs-appellees.

Before THORNBERRY, AINSWORTH and MORGAN, Circuit Judges.

AINSWORTH, Circuit Judge:

In this Texas diversity action, defendant Carl Archer appeals the judgment following a jury trial awarding plaintiffs Ron Patton and Thomas Runyon, d/b/a P&R Cattle Company, damages for breach of contract and attorneys' fees. Archer contends that the district court erred in its instructions to the jury, attacks the sufficiency of the evidence and asserts that the recovery of attorneys' fees was improper under Texas law. We affirm the award of damages but reverse that part of the district court's judgment pertaining to attorneys' fees.

*I. Facts*

P&R Cattle Company ("P&R") is a partnership in which Ron Patton and Thomas Runyon are equal partners. Patton is also the president and principal stockholder of the Coffeeville Livestock Sales Company, Inc. ("CLSC"), a market agency registered under the Packers and Stockyards Act, 7 U.S.C.A. § 181 *et seq.,* and licensed to buy and sell cattle on commission, while Runyon is president and major stockholder of the National Order Buying Company ("NOBC"), another market agency registered under the Act and licensed to trade cattle on commission.

*1500–Head Contract*

Patton and NOBC purchased 1500 head of cattle on July 21, 1973. On July 26, Patton and Archer reached verbal agreement on the sale of 1500 steers, at $54 per hundredweight. NOBC transferred the 1500 head to P&R on July 27 and that same day Patton reduced his oral agreement with Archer to a written contract, identifying P&R as seller and Archer as buyer. Patton signed the agreement and mailed it to Archer, who also executed the contract and returned it to Patton. On August 1, CLSC drew a draft on Archer in the amount of $30,000 as partial payment under the contract; Archer's bank paid the draft when presented on August 9. The cattle were weighed and delivered to Archer in two loads, on October 4 and 9, at a time when the cattle market had broken and the price of steers was dropping. On October 9, P&R drew a draft on Archer in the amount of $449,584.73 for the balance due under the 1500–head contract, but Archer refused to pay the draft without further proof of P&R's clear title to the cattle. Archer formally revoked his acceptance by letter dated November 1, 1973 and NOBC subsequently reclaimed and resold the steers.

*400–Head Contract and 880–Head Contract*

Patton and Archer reached two other verbal agreements on August 10, 1973, one covering the sale of 400 head of cattle, at $61.50 per hundredweight, and the other the sale of 880 steers at $54 per hundredweight. Patton reduced these agreements to writing, executed them and mailed them to Archer, who received the contracts, both of which designated P&R as seller and Archer as buyer, within a few days of August 10. Archer did not sign or return

either contract. On August 13, CLSC drew a draft on Archer in the amount of $8,000 for partial payment under the 400–head contract; Archer's bank paid the draft when presented on August 20. Archer gave written notice of his objections respecting the 400–head and 880–head contracts in a letter dated October 8, 1973, at which time cattle prices were dropping, and refused to accept delivery of the steers under either contract. Following Archer's refusal, NOBC resold the cattle.

P&R filed suit, seeking damages for breach of the three contracts. In defense, Archer asserted at trial that P&R had breached its title warranties under the 1500–head contract by delivering the cattle without having cleared them of all encumbrances and alleged that he had not orally agreed to purchase steers of the descriptions set forth in the 400–head and 880–head contracts. Archer also contended that P&R had fraudulently induced his consent to the three contracts, arguing that P&R had acted as his agent in the transactions and had violated its fiduciary duty by failing to disclose various dealings between itself, CLSC and NOBC.

At trial's end the district judge submitted to the jury, along with clarifying instructions, the seven special issues set forth in the margin.[1] Responding to these special issues, the jurors found from a preponderance of the evidence that P&R had not breached the 1500–head contract by failing

to deliver the cattle free of all encumbrances; that the parties had agreed on the sale of steers of the descriptions set forth in the 400–head and 880–head contracts; that P&R had not induced Archer's consent to any of the contracts by fraud; and that P&R was entitled to recover $20,000 in attorneys' fees.

The district court ordered that P&R recover a total of $154,304.46 in damages plus interest and $20,000 in attorneys' fees and Archer appealed.

## II. The Trial Court's Jury Instruction

Appellant Archer contends that the district court erred in failing to instruct the jury that P&R's conduct by law created an agency relationship, as defined by the Packers and Stockyards Act, 7 U.S.C. § 181 et seq. ("Act"), between P&R and Archer. However, Archer did not object to the trial judge's failure to give this charge before the case went to the jury and "[n]o party may assign as error the giving or the failing to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Fed.R.Civ.P. 51. It is true that even absent such objection "an appellate court will notice error so fundamental as to result in a miscarriage of justice," but "that power will only be exercised in exceptional cases," *Delancey v. Motichek Towing Ser-*

---

1. The jury's answer to each special issue appears in parenthesis:

1. "Do you find from a preponderance of the evidence that the Plaintiffs breached the contract covering the approximately 1500 head of cattle by failing to deliver the cattle free of all incumbrances [sic] and with a clear title?" (No)

2. "Do you find from a preponderance of the evidence that the Plaintiffs agreed to sell and the Defendants agreed to buy steers of the description set forth in the 400 head contract?" (Yes)

3. "Do you find from a preponderance of the evidence that the Plaintiffs agreed to sell and the Defendant agreed to buy steers of the description set forth in the 880 head contract?" (Yes)

4. "Do you find from a preponderance of the evidence that the [P]laintiff induced the

[D]efendant's consent to the contract covering the approximately 1500 head of steers by fraud?" (No)

5. "Do you find from a preponderance of the evidence that the [P]laintiffs induced the [D]efendant's consent to the contract covering the approximately 400 head of steers by fraud?" (No)

6. "Do you find from a preponderance of the evidence that the [P]laintiffs induced the [D]efendant's consent to the contract covering the approximately 880 head of steers by fraud?" (No)

7. "Find from a preponderance of the evidence the sum of money that would represent a reasonable amount for the services of [P]laintiffs' attorneys in their representation of [P]laintiffs in the filing, preparation and trial of this suit. Answer in dollars and cents or none." ($20,000)

*vice, Inc.,* 5 Cir., 1970, 427 F.2d 897, 901, and this is not such a case. The district court adequately instructed the jury on the definition of fraud, the meaning of agency under both the Act and Texas law and an agent's duty fully to disclose material facts to his principal. Whether P&R acted as Archer's agent in obtaining the cattle or sold the steers in arm's length transactions was a matter of factual dispute between the parties and the trial judge properly left the resolution of that dispute to the jury.

### III. The Sufficiency of the Evidence

Archer also challenges the sufficiency of the evidence supporting the jury's findings that P&R did not fraudulently induce his consent to the three contracts, that P&R delivered the cattle under the 1500–head contract free of encumbrances, with clear title, and that Archer agreed to buy steers of the description set forth in the 400– and 880–head contracts. However, at trial Archer failed to move for a directed verdict and "in this Circuit it is well established that the sufficiency of the evidence supporting . . . the jury's findings is not reviewable on appeal unless the party seeking review has made a motion for a directed verdict in the trial court. This rule applies to diversity cases." *Little v. Bankers Life & Casualty Co.,* 5 Cir., 1970, 426 F.2d 509, 510. "We may inquire whether there was *any* evidence supporting . . . the jury's finding . . . but we may not question the sufficiency of whatever evidence we do find. Our consideration is limited to whether plain error has been committed which, if not noticed, would result in a manifest miscarriage of justice." *Id.* at 511; *American Lease Plans, Inc. v. Houghton Const. Co., Inc.,* 5 Cir., 1974, 492 F.2d 34, 35. Our review of the record satisfies us that there was adequate evidence supporting the jury findings challenged by appellant and that no plain error occurred.

### IV. The Admissibility of the Cattle Price Chart

Archer next asserts that the district court erred in allowing P&R's counsel to use during closing argument a chart depicting fluctuations in the cattle futures market, since the price of futures on regulated commodity markets "cannot be correlated" with the price for country cattle like those involved in his three transactions with P&R. This argument is without merit. According to expert testimony at trial, changes in country cattle prices in October 1973, when the steers were to be delivered under the three contracts, mirrored shifts in the futures market; when futures rose or fell, the price of country cattle moved in the same direction. Appellant's counsel conceded that "the market went up and down" and the trial judge instructed the jury that "the only purpose for admitting that chart into evidence is to show the state of the cattle market, that is the prices going up and down as has been testified here and will not be considered by you for any other purposes." The district court did not err in admitting the chart into evidence.

### V. The Award of Attorneys' Fees

Finally, Archer contests that part of the district court's judgment allowing P&R to recover $20,000 in attorneys' fees. P&R asserts that Tex.Rev.Civ.Stat.Ann. Art. 2226 (Vernon) permits such an award, but our review of Texas law convinces us that Art. 2226 is inapplicable and that the lower court erred in allowing the recovery of attorneys' fees.

Art. 2226 provides that

[a]ny person having a valid claim against a person or corporation for personal services rendered, labor done, material furnished, overcharges on freight or express, lost or damaged freight or express, or stock killed or injured, *or suits founded upon a sworn account or accounts,* may present the same to such person or to any duly authorized agent thereof; and if, at the expiration of thirty (30) days thereafter, the claim has not been paid or satisfied, and he should finally obtain judgment for any amount thereof as presented for payment to such person or corporation, he may also recover, in addition to his claim and costs, a

reasonable amount as attorney's fees, if represented by an attorney. (emphasis added)

 P&R contends that its suit against Archer is "founded upon a sworn account or accounts" within the meaning of the statute, but we disagree. Under Texas law, a sworn account is defined "according to its popular sense and applies only to transactions between parties, in which there is a sale upon one side and a purchase upon the other, and the relation of debtor and creditor is thereby created by general course of dealing (which may include only. one transaction between the parties). It does not mean transactions between parties resting upon special contract." *Meaders v. Biskamp*, 159 Tex. 79, 80, 316 S.W.2d 75, 78 (1958). There can be no sworn account unless the action is "founded on and arising out of a general course of dealing between the parties," *Dolenz v. Employers Casualty Co.*, 504 S.W.2d 625, 629–30 (Tex.Civ.App., 1974), in which "some one or more elements of the contractual agreement between the parties remains open, that is, remains to be ascertained." *Pines California, Inc. v. Miller*, 446 S.W.2d 91, 95 (Tex.Civ.App., 1969). Thus, if the terms of an agreement are "sufficiently definite," a sworn account will not result. *Ball v. Cooper-Stanley Co.*, 413 S.W.2d 467, 469 (Tex.Civ.App., 1967). Moreover, "[w]here the recovery is based on express contract, it may not at the same time be based on 'sworn account,'" which is an "implied contract situation[ ]." *Success Motivation Institute, Inc. v. Jamieson Film Co.*, 473 S.W.2d 275, 282 (Tex.Civ.App., 1971). Here, P&R based its suit for breach of contract on three express, written agreements with "fixed and certain" terms, *Pines California, Inc. v. Miller, supra*, 446 S.W.2d at 95, so the implied contractual remedy of sworn account was not properly available. Accordingly, we reverse the district court's award of attorneys' fees.

AFFIRMED IN PART; REVERSED IN PART.