818 F.2d 776
 Doris GHOLSTON, Ind. and on behalf of all others similarly
situated, Plaintiffs-Appellants,
v.
The HOUSING AUTHORITY OF the CITY OF MONTGOMERY; J.C.
Miller, Ind. and in his official capacity as Executive
Director of the Housing Authority of the City of Montgomery;
Jesse H. Griffin; Frank Parquette; Jerry Kyser; John F.
McKnight, Jr. and Anne B. Upchurch, Ind. and in their
official capacities as members of the Board of Commissioners
of the Housing Authority of the City of Montgomery,
Defendants-Appellees.
 No. 85-7555.
 United States Court of Appeals,
Eleventh Circuit.
 June 9, 1987.
Rehearing and Rehearing En Banc Denied July 22, 1987.
 
 Patricia E. Ivie, Robert J. Varley, Legal Services Corp. of Alabama, Montgomery, Ala., for plaintiffs-appellants.
 Michael S. Jackson, Melton & Espy, Montgomery, Ala., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before TJOFLAT and ANDERSON, Circuit Judges, and MORGAN, Senior Circuit Judge.
 TJOFLAT, Circuit Judge:
 
 
 1
 The appellants in this case are applicants for public housing who brought a class action against the Housing Authority of the City of Montgomery, Alabama and various officials of the housing authority (hereinafter referred to collectively as the MHA). Appellants contend that the MHA violated provisions of the United States Housing Act of 1937, 42 U.S.C. Secs. 1401-1440 (1982 & Supp. III 1985), and of the implementing regulations issued by the United States Department of Housing and Urban Development (HUD). Specifically, they allege that the MHA (1) categorically denied admission to public housing applicants whose rent payments would be one to twenty dollars per month and to those who would be entitled to zero or negative rent, see 24 C.F.R. Sec. 960.204(c)(1) (1986); (2) failed to implement statutorily mandated admission preferences for displaced families, families occupying substandard housing, and families paying more than fifty percent of their income for housing, see 42 U.S.C. Sec. 1437d(c)(4)(A) (1982 & Supp. III 1985); (3) held housing units vacant to await higher income tenants while lower income applicants remained on a waiting list, see id.; (4) failed to comply with the 1981 and 1983 amendments to the Housing Act, which limit the percentage of available housing units that can be filled by families other than very low income families, see 42 U.S.C. Sec. 1437n (1982 & Supp. III 1985) (codifying 1981 and 1983 amendments); and (5) failed to advise very low income families of an approximate occupancy date, in violation of 24 C.F.R. Sec. 960.207(b) (1986). Appellants sought injunctive and monetary relief for these violations under 42 U.S.C. Sec. 1983 (1982).[1]
 
 
 2
 After a bench trial, the district court found that the MHA had not violated any provision of the Housing Act or HUD regulations, and therefore entered judgment for the appellees. This appeal followed.
 
 I.
 
 3
 Congress enacted the Housing Act "to assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income." 42 U.S.C. Sec. 1437 (1982). To further these objectives, the Act authorizes HUD to provide low interest loans, grants, and other assistance for the construction and operation of housing for low income families. See, e.g., id. Secs. 1437b-d, 1437g & 1437i (1982 and Supp. III 1985). By subsidizing local housing authorities like the MHA, Congress enables, and requires, the housing authorities to set rents for eligible low income tenants below the market price. See id. Sec. 1437a(a). Other provisions of the Housing Act govern the housing authorities' admissions policies, see id. Sec. 1437d(c)(3)-(4)(A), administrative grievance procedures, id. Sec. 1437d(k), and lease terms and conditions, id. Sec. 1437d(l).
 
 
 4
 One general policy of the Housing Act is "to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs." Id. Sec. 1437. Local housing authorities must, however, comply with the Housing Act's statutory directives and with HUD regulations.
 
 
 5
 This case concerns the MHA's compliance, since 1982, with the Housing Act's admissions provisions. The Housing Act permits housing authorities to rent dwelling units "only to families who are lower income families at the time of their initial occupancy" of the units. Id. Sec. 1437a(a); see also 24 C.F.R. Sec. 913.103 (1986). "Lower income families" are defined as families whose income, adjusted for family size, does not exceed eighty percent of the median family income for their geographic area. 42 U.S.C. Sec. 1437a(b)(2) (Supp. III 1985); 24 C.F.R. Sec. 913.102(e) (1986).
 
 
 6
 In 1981, Congress amended the Housing Act in order to redirect limited housing funds to the neediest of families. Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97-35, Title III, Sec. 323, 95 Stat. 404 (codified as amended at 42 U.S.C. Sec. 1437n (1982 & Supp. III 1985)); see S.Rep. No. 139, 97th Cong., 1st Sess. 229-30, reprinted in 1981 U.S.Code Cong. & Admin.News 396, 525-26. The new provision of the Housing Act provided as follows:
 
 
 7
 Not more than 10 per centum of the dwelling units which were available for occupancy under public housing annual contributions contracts ... under [the Housing Act] before October 1, 1981, and which will be leased on or after October 1, 1981, shall be available for leasing by lower income families other than very low-income families.
 
 
 8
 42 U.S.C. Sec. 1437n(a) (1982) (amended 1983).[2] Two years later, Congress amended this provision to permit housing authorities to rent up to twenty-five percent of dwelling units to families other than "very low-income families." Domestic Housing & International Recovery & Financial Stability Act, Pub.L. No. 98-181, Title II, Sec. 213, 97 Stat. 1184 (1983) (codified at 42 U.S.C. Sec. 1437a (Supp. III 1985)); see also 24 C.F.R. Sec. 913.104 (1986). The term "very low-income families," as used in the Housing Act, refers to lower income families whose income, adjusted for family size, does not exceed fifty percent of the median family income in the relevant geographic area. 42 U.S.C. Sec. 1437a(b)(2) (1982 & Supp. III 1985); 24 C.F.R. Sec. 913.102(e) (1986). Thus, to comply with section 1437n(a), as amended, a housing authority must lease at least seventy-five percent of its dwellings to very low income families; the housing authority may lease the remainder of its dwellings to low income families.
 
 
 9
 In addition to setting eligibility requirements for applicants for public housing, the Housing Act permits HUD to establish "preferences" among otherwise eligible applicants and to set goals for local housing authorities:
 
 
 10
 Every contract for annual contributions [between HUD and the local housing authority] shall provide that ... the public housing agency shall comply with such procedures and requirements as the Secretary may prescribe to assure that sound management practices will be followed in the operation of the project, including requirements pertaining to ... the establishment of tenant selection criteria which gives preference to families which occupy substandard housing or are involuntarily displaced at the time they are seeking assistance under this chapter or are paying more than 50 per centum of family income for rent and which is designed to assure that, within a reasonable period of time, the project will include families with a broad range of incomes and will avoid concentrations of lower income and deprived families with serious social problems, but this shall not permit maintenance of vacancies to await higher income tenants where lower income tenants are available....
 
 
 11
 42 U.S.C. Sec. 1437d(c)(4)(A) (Supp. III 1985). Under this provision, HUD is authorized to promulgate four tenant selection criteria: (1) a preference for families occupying substandard housing; (2) a preference for families who are involuntarily displaced; (3) a preference for families who are paying more than fifty percent of their income for rent; and (4) criteria designed to establish an economic mix of tenants, avoiding "concentrations of lower income and deprived families with serious social problems," but constrained by the requirement that the public housing authority cannot maintain vacancies to await higher income tenants when lower income tenants are available.
 
 
 12
 Finally, HUD regulations require that local housing authorities follow prescribed procedures for informing applicants of their eligibility for low-income housing and of the availability of such housing. Those regulations provide as follows:
 
 
 13
 (a) The [local housing authority] shall promptly notify any applicant determined to be ineligible for admission to a project of the basis for such determination and shall provide the applicant upon request, within a reasonable time after the determination is made, with an opportunity for an informal hearing on such determination.
 
 
 14
 (b) When a determination has been made that an applicant is eligible and satisfies all requirements for admission including the tenant selection criteria, the applicant shall be notified of the approximate date of occupancy insofar as that date can be reasonably determined.
 
 
 15
 24 C.F.R. Sec. 960.207(a)-(b) (1986).
 
 II.
 
 16
 We begin our review of the district court's decision by noting that there is some question whether the admissions provisions of the Housing Act and HUD's implementing regulations establish rights enforceable under 42 U.S.C. Sec. 1983 (1982), and whether Congress has established a comprehensive enforcement scheme in lieu of section 1983 enforcement. See generally Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); Pennhurst State School & Hosp. v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). The Supreme Court, in its recent decision in Wright v. City of Roanoke Redevelopment and Hous. Auth., --- U.S. ----, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), resolved analogous issues with regard to the Brooke Amendment to the Housing Act, Pub.L. No. 91-152, Sec. 213, 83 Stat. 379, 389 (1969) (codified as amended at 42 U.S.C. Sec. 1437a (1982 & Supp. III 1985)). In Wright, public housing tenants brought suit under section 1983, alleging that the defendant housing authority overcharged them for their utility services in violation of the Brooke Amendment. The Court observed that the Housing Act and the Brooke Amendment gave public housing tenants rights, which, under Supreme Court precedent, were cognizable under section 1983, and noted that Congress did not expressly preclude the tenants' section 1983 claim against the local housing authority. In addition, the Court held that Congress did not include a comprehensive enforcement scheme in the Housing Act and thus did not implicitly foreclose relief under section 1983.
 
 
 17
 Although Wright involved the rent ceiling of the Housing Act instead of the admissions provisions implicated in this suit, the Supreme Court's reasoning in that case guides our analysis. In particular, the Court's conclusion that Congress did not expressly or implicitly preclude section 1983 claims based on violations of the Housing Act probably applies with equal force in this case. Whether the admissions provisions create rights enforceable under section 1983 is, however, a more difficult question.
 
 
 18
 In this case, we need not determine whether the appellants state a claim upon which relief can be granted, because the MHA failed to raise this question on appeal. The district court denied the MHA's pretrial motion to dismiss, see Fed.R.Civ.P. 12(b)(6), as well as its motion for judgment on the pleadings at the conclusion of the bench trial. The MHA did not choose to cross-appeal from these rulings; nor did it raise the issue in its initial brief on appeal.[3] Because the failure to state a claim is not a jurisdictional question, see Davis v. Passman, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1979); Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), we need not address the issue sua sponte, particularly when there is no "plain error."[4] See Tyler v. Pasqua, 748 F.2d 283, 287 (5th Cir.1984) (unlike subject matter jurisdiction, the defendant generally must raise the issue of failure to state a claim and may waive that defense); see also Dick v. New York Life Ins. Co., 359 U.S. 437, 444-45, 79 S.Ct. 921, 926, 3 L.Ed.2d 935 (1959) (declining to address a threshold question, whether the state or federal standard for sufficiency of the evidence supporting a jury verdict should be applied in diversity cases, because it was not raised by the parties and the standards "are substantially the same"); United States v. Spector, 343 U.S. 169, 172, 72 S.Ct. 591, 593-94, 96 L.Ed. 863 (1952) (in case involving alleged vagueness of deportation statute, Court refused to consider another constitutional ground for overturning the statute because "[t]hat question was neither raised by the appellee nor briefed nor argued here"); Freeman v. B & B Assocs., 790 F.2d 145, 151 (D.C.Cir.1986) ("An appellate court ... will freely consider any argument by an appellee that supports the judgment of the district court....") (emphasis added); cf. Dart v. Brown, 717 F.2d 1491, 1493 n. 1 (5th Cir.1983) (refusing to resolve issue of failure to state a claim in light of appellee's failure to cross-appeal from favorable judgment on the merits), cert. denied, 469 U.S. 825, 105 S.Ct. 105, 83 L.Ed.2d 49 (1984).
 
 
 19
 Moreover, to decide this appeal on the merits, it is not necessary to resolve the issue of failure to state a claim. In some cases, a court of appeals, as a logical matter, may need to decide whether a party's allegations properly state a claim before reaching the merits of an appeal. Cf. Ammar v. American Export Lines, Inc., 326 F.2d 955, 959 (2d Cir.) ("Although [appellee's] point was not properly preserved by an objection to the jury instructions, we rule upon it since its decision was implicit in our analysis of [an issue before the court].") (citation omitted), cert. denied, 379 U.S. 824, 85 S.Ct. 48, 13 L.Ed.2d 34 (1964). Here, however, the MHA indisputably has certain duties under the Housing Act and HUD regulations, and the appellants alleged that they were harmed by its violations of those duties. We need not decide the underlying question--whether appellants can bring suit under section 1983 or whether HUD is the exclusive enforcer of federal housing law--in order to determine whether the MHA violated the Housing Act or HUD regulations. In sum, in discussing the merits of this case, we intimate no view as to whether the types of claims appellants present can withstand a motion to dismiss for failure to state a claim.
 
 III.
 
 20
 In assessing whether the MHA has violated the rights of public housing applicants, we note that the Housing Act gives local housing authorities discretion to select applicants and otherwise to manage the day-to-day affairs of the subsidized housing projects. See 42 U.S.C. Sec. 1437 (1982) (local housing authorities given "maximum amount of responsibility" to administer subsidized housing). The administration of local housing authorities is a difficult task, particularly because the number of applicants greatly exceeds the available housing. See Fletcher v. Housing Auth. of Louisville, 491 F.2d 793, 798 (6th Cir.), vacated, 419 U.S. 812, 95 S.Ct. 27, 42 L.Ed.2d 39 (1974), reinstated on remand, 525 F.2d 532 (6th Cir.1975). Consequently, the scope of judicial review of a local housing authority's policies and practices is limited, and we will not view its actions as a violation of the Housing Act or HUD regulations unless it abused its discretion. See Fletcher, 491 F.2d at 798.
 
 A.
 
 21
 The appellants' first claim at trial was that the MHA categorically denied admission to applicants whose estimated monthly rent ranged from one to twenty dollars and to those who would be entitled to zero or negative rent.[5] Low-income and very low-income tenants can be classified according to the amount of rent they must pay, and the appellants represented those falling within the two lowest rent ranges of eligible applicants for public housing. The parties stipulated that a large majority of these applicants are families who receive welfare payments and who have a single, black female as the head of the household. The exclusion of applicants from the lowest rent ranges allegedly violated HUD regulations, which provide that local housing authorities shall "[n]ot automatically deny admission to a particular group or category of otherwise eligible applicants (e.g., unwed mothers or families with children born out of wedlock)." 24 C.F.R. Sec. 960.204(c)(1) (1986). The appellants also contended that the MHA's policies and practices violated 24 C.F.R. Sec. 960.205(a) (1986) ("The criteria to be established and information to be considered shall be reasonably related to individual attributes and behavior of an applicant and shall not be related to those which may be imputed to a particular group or category of persons of which an applicant may be a member.") (citation omitted).
 
 
 22
 The district court believed that appellants sought "overriding priorities ... [for] persons whose rent would be $20.00 a month or less," and indicated that such a policy would violate Congress' goal of "assur[ing] that, within a reasonable period of time, the [housing] project will include families with a broad range of incomes and will avoid concentrations of lower income and deprived families with serious social problems." 42 U.S.C. Sec. 1437d(c)(4)(A) (1982 & Supp. III 1985).
 
 
 23
 The gist of appellants' claim, however, is not that applicants from the lowest rent ranges should receive preference over eligible applicants from higher rent ranges. Neither Congress nor HUD has ever mandated that local housing authorities grant such a preference; indeed, this preference is inconsistent with the Housing Act's requirement that housing authorities attain an economic mix of eligible tenants. See id. Appellants merely contend that the MHA violated HUD regulations by automatically denying admission to applicants in the lowest rent ranges.
 
 
 24
 Congress' requirement that local housing authorities seek, within a reasonable time, to house families from a broad range of low incomes, see id., is entirely consistent with HUD's requirement that local housing authorities not automatically deny admission to categories of otherwise eligible applicants, see 24 C.F.R. Sec. 960.204(c)(1) (1986). To comply with these requirements, a local housing authority must not categorically exclude applicants from the lowest income ranges.
 
 
 25
 The district court made no specific finding on the factual issue whether, during the years from 1982 to 1985, the MHA categorically excluded applicants in the lowest rent ranges, particularly the zero to negative range.[6] Consequently, we vacate the district court's determination that the MHA complied with 24 C.F.R. Sec. 960.204(c)(1) (1986) and remand for further findings on this issue. On remand, the district court, giving due deference to the decisions of the MHA, should determine if it had a policy or practice of categorically excluding applicants from the lowest rent ranges.
 
 B.
 
 26
 Appellants' second claim is that the district court erred in concluding that the MHA did not violate the applicable preference provisions of the Housing Act and of HUD's implementing regulations. As noted above, the Housing Act, as amended, states in relevant part: "Every contract for annual contributions shall provide that ... the public housing agency shall comply with such procedures and requirements as the Secretary may prescribe to assure that sound management practices will be followed in the operation of the project, including ..." the establishment of (1) preferences for families occupying substandard housing, (2) preferences for families who are involuntarily displaced, (3) preferences for families paying more than fifty percent of their income for rent, and (4) criteria designed to attain an economic mix of tenants. 42 U.S.C. Sec. 1437d(c)(4)(A) (1982 & Supp. III 1985).
 
 
 27
 This provision and HUD's implementing regulations were modified a number of times during the time period relevant to this case. Prior to 1979, section 1437d(c)(4)(A) listed only the fourth criterion, the economic mix requirement, and HUD issued regulations in accordance with the provision as it was then written.[7] In 1979, Congress amended this provision to include preferences for families who occupy substandard housing or who have been involuntarily displaced. Housing and Community Development Amendments of 1979, Pub.L. No. 96-153, Title II, Sec. 206(a), 93 Stat. 1108. HUD's regulations, which were amended in 1980, did not include any reference to the new preferences Congress enumerated in its 1979 amendments.[8] Finally, in 1983, Congress added a preference for families who are paying more than fifty percent of their income for rent. Domestic Housing and International Recovery and Financial Stability Act, Pub.L. No. 98-181, Title II, Sec. 203(a), 97 Stat. 1153, 1178 (1983). HUD subsequently modified its regulations governing admission to public housing, but did not promulgate any regulation[9] concerning preferences for the three categories of families enumerated in section 1437d(c)(4)(A). See 24 C.F.R. Secs. 960.204, 960.205 (1986).[10]
 
 
 28
 Thus, the question we must decide is whether these preference provisions are self-executing, i.e., whether the MHA must grant applicants these preferences in the absence of implementing regulations promulgated by HUD. The express language of section 1437d(c)(4)(A) simply indicates that local housing authorities "shall comply with such procedures and requirements as the Secretary may prescribe." 42 U.S.C. Sec. 1437d(c)(4)(A) (1982 & Supp. III 1985) (emphasis added). By its express terms, the statute does not require HUD to prescribe preferences;[11] nor does it require local housing authorities to grant preferences absent HUD implementing regulations. The legislative history of the preference provision does not discuss whether Congress intended to create a self-executing preference requirement or to authorize HUD, in its discretion, to promulgate the preference requirements. See generally S.Rep. No. 142, 98th Cong., 1st Sess. 32-33, reprinted in 1983 U.S.Code Cong. & Admin.News 1770, 1803-04 (explaining preference provisions applicable to the public housing program involved in this case, as well as the provisions applicable to other housing programs); H.R.Rep. No. 154, 96th Cong., 1st Sess. 16, reprinted in 1979 U.S.Code Cong. & Admin.News 2317, 2332 (discussing preference provisions).
 
 
 29
 Given that HUD possesses a large degree of discretion to administer the Housing Act programs and that local housing authorities have discretion to manage the housing projects on a day-to-day basis, we hold that section 1437d(c)(4)(A) is not self-executing. Thus, until HUD promulgates final rules mandating that local housing authorities grant preferences for families occupying substandard housing, displaced families, and families paying more than fifty percent of their income for rent, local housing authorities are not required to grant these preferences. They may grant the preferences on their own initiative, so long as they otherwise comply with the Housing Act and HUD regulations, but they do not violate the Act by failing to do so. We therefore affirm the district court's determination that the MHA did not violate the Housing Act's preference provisions.
 
 C.
 
 30
 Appellants' next claim is that the district court erred in concluding that the MHA did not hold dwelling units vacant, while applicants from lower income ranges were available, in order to await applicants from higher income ranges. The parties do not dispute that the Housing Act and HUD regulations prohibit local housing authorities from holding units vacant to await higher income applicants when applicants from lower rent ranges are available. See 42 U.S.C. Sec. 1437d(c)(4)(A) (1982 & Supp. III 1985); 24 C.F.R. Sec. 960.205(c)(8) (1986). Rather, their disagreement centers on whether the evidence at trial supported the district court's conclusion.
 
 
 31
 The evidence on this issue was conflicting. Appellants rely principally on a HUD audit report, which criticized the MHA for having a large number of vacancies in 1981 to 1983 "because [the] maintenance [department] had been slow to repair vacant units and the MHA had decided to leave some units vacant rather than to rent them at low rates." Finding that the latter practice was a "contributing factor to high vacancies," the audit report recommended that "[i]f the MHA cannot rent to higher income tenants, vacant units should be made available to other eligible applicants." MHA officials, on the other hand, testified that the MHA did not maintain vacancies to await higher income tenants. They indicated that its high vacancy rate was caused by delay in modernization and maintenance of vacated units, in contacting prospective tenants, and in processing the applications of new tenants.
 
 
 32
 The district court's finding of fact on this issue will not be disturbed absent clear error. Fed.R.Civ.P. 52(a); United States v. United States Gypsum Co., 333 U.S. 364, 394-95, 68 S.Ct. 525, 541-42, 92 L.Ed. 746 (1948); Hardin v. Stynchcomb, 691 F.2d 1364, 1372 (11th Cir.1982). In light of the evidence that the MHA suffered from a high turnover rate and that legitimate reasons existed for its high vacancy rate, we do not believe that the district court's conclusion was clearly erroneous. We therefore affirm its decision on this claim.
 
 D.
 
 33
 Finally, the appellants contend that the district court erroneously concluded that the MHA complied with 42 U.S.C. Sec. 1437n(a) (1982 & Supp. III 1985), which requires that no more than twenty-five percent[12] of the local housing authority's dwelling units be leased to families other than very low-income families. See also 24 C.F.R. Sec. 913.104 (1986). The first issue involved in this claim is whether the twenty-five percent ceiling of section 1437n(a) applies to the percentage of other than very low-income families admitted in a given period, or to the percentage of such families in the entire tenant population of the housing authority. In concluding that the MHA complied with section 1437n(a), the district court discussed both the percentage of families admitted from 1981 to 1984 and the percentage of those families in the total tenant population during those years.
 
 
 34
 We hold that the correct reading of section 1437n is that it establishes a maximum limit on the number of families other than very low-income families newly admitted into public housing. This view is supported by HUD's implementing regulations. See 24 C.F.R. Sec. 913.104(b) (1986) (for purposes of compliance with section 1437n, local housing authorities shall maintain records of "the number of Families occupying [subsidized housing] units that were admitted to them on or after July 1, 1984 and were not Very Low-Income Families when admitted ") (emphasis added); id. Sec. 913.104(a) ("[Section 1437n] provides that not more than 25 percent of the dwelling units that were available for occupancy under public housing Annual Contributions Contracts ... taking effect before October 1, 1981 and that are leased on or after that date shall be available for leasing by Lower Income Families other than Very Low-Income Families.") (emphasis added).
 
 
 35
 In this case, the district court apparently found that over ninety percent of families admitted during each year from 1981 to 1984 were very low-income families.[13] Although the court also discussed the percentage of families in the total tenant population that were very low-income families, which is not relevant to the section 1437n issue, we affirm based on the court's finding on the MHA's admissions practices during 1981 to 1984.[14]
 
 IV.
 
 36
 In sum, we vacate the district court's ruling that the MHA did not violate 24 C.F.R. Sec. 960.204(c)(1) (1986) and remand this case for reassessment of the evidence and a specific finding on this issue. On remand, the district court should also determine if applicants for MHA housing who are in rent ranges above twenty dollars per month should be joined in this action as necessary parties. See Fed.R.Civ.P. 19; see also Fed.R.Civ.P. 21 ("Parties may be ... added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just."). The interests of these persons in obtaining MHA housing may be affected by a favorable ruling for appellants because the appellants' remedies may include changes in the ordering of applicants on the MHA waiting list. In all other respects, the decision of the district court is affirmed.
 
 
 37
 AFFIRMED in part, VACATED in part, and REMANDED.
 
 
 38
 ANDERSON, Circuit Judge, concurring in part and dissenting in part.
 
 
 39
 I concur in Judge Tjoflat's opinion, except for its failure in Part III.B. to enforce the statutory preferences[1] for families which occupy substandard housing, for families which have been involuntarily displaced, and for familiies which pay more than 50% of their income for rent. I respectfully dissent from Part III.B. of Judge Tjoflat's opinion because a thorough investigation of legislative history persuades me that Congress intended for the statutory preferences to be honored by public housing authorities regardless of the promulgation of regulations by HUD. Moreover, it is clear in the legislative record that the "economic mix" criteria has been deemphasized by Congress. While that factor should not be ignored, it would be error for a public housing authority to have an absolute preference for higher-income tenants over those applicants who qualify for the statutory preferences for families in substandard housing, displaced families, or families paying more than 50% of their income in rent. It is undisputed in this case that the Montgomery Housing Authority had an absolute preference for higher-income tenants over applicants who qualified for the foregoing three statutory preferences. Because this violates the preference provisions of the statute, I would reverse.
 
 
 40
 Judge Tjoflat's opinion correctly traces the somewhat convoluted history of 42 U.S.C. Sec. 1437d(c)(4)(A). In 1974, the Housing Act of 1937 was amended to include a provision requiring public housing authorities to consider "economic mix" in the selection of tenants. Housing and Community Development Act of 1974, Pub.L. No. 93-383, Title II, Sec. 201(a), 88 Stat. 660. In 1979, Congress further amended this section to include the requirement that public housing authorities have tenant selection criteria which include preferences for families which occupy substandard housing or which have been involuntarily displaced. Housing & Community Development Amendments of 1979, Pub.L. No. 96-153, Title II, Sec. 206(a), 93 Stat. 1108. The third preference for families which are paying more than 50% of their income for rent was added in 1983. Domestic Housing & International Recovery and Financial Stability Act, Pub.L. No. 98-181, Title II, Sec. 203(a), 97 Stat. 1153, 1178 (1983).
 
 
 41
 In 1981, the Senate proposed another amendment to the Housing Act--to eliminate the "economic mix" requirement altogether. S.Rep. No. 139, 97th Cong., 1st Sess. 235, 255 reprinted in 1981 U.S.Code Cong. & Ad.News 396, 531, 551. The Senate observed that "[t]his economic mix policy has the ill effect of giving moderate income families priority for housing subsidies while truly poor families remain on waiting lists." 1981 U.S.Code Cong. & Ad.News at 530. In this same Report, the Senate repeatedly emphasized its commitment to providing public housing to the neediest of families:
 
 
 42
 The Committee's other principal purpose in adopting Title II of the bill is to focus limited housing assistance funds on those who need the taxpayer's help the most.... Because funds are limited, each moderate-income family that gets into the programs effectively reduces the odds that a truly poor family can be decently housed.
 
 
 43
 The Committee believes it is a fairer and more compassionate policy to limit eligibility to the more needy.... [T]he Committee rejects the argument that for cost reasons moderate-income people should get housing while the poor wait in line.... The government's purpose in lower-income housing programs ... should be to help those who most need assistance.
 
 
 44
 The Committee also believes that local public housing agencies ... should not be required to pursue a policy of obtaining tenants with a mix of different income levels. The managers of these programs should be free to house the neediest households first.
 
 
 45
 Id. at 525-26. Also proposed by the Senate Report and adopted in conference were provisions to reduce income eligibility for applicants for public housing and to reduce the percentage of units available for families other than very-low income.
 
 
 46
 The Conference Report did not adopt the Senate's amendment regarding the abolition of the economic mix criteria. However, the Conference Report did not reject the Senate proposal out of hand; rather, it acknowledged a concern about the way in which the "economic mix" criteria was being applied:
 
 
 47
 The conferees are also concerned that in carrying out the policy of creating a mix of families having a broad range of lower incomes in assisted housing that families whose incomes are between 50 and 80 percent of median not be given a priority for occupancy by virtue of their income. In addition, the conferees do not intend that a community should be required to achieve the same distribution of incomes between lower income families living in assisted housing and lower income families living in the community at large. Such a rigid formula can inhibit a community from fulfilling the basic purpose of the assisted housing programs without delay--to aid lower income families in obtaining a decent place to live.
 
 
 48
 H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 695, reprinted in 1981 U.S.Code Cong. & Ad.News 1010, 1054. Thus, I take the legislative history behind the 1981 Amendment to mean that the "economic mix" factor, while still a criteria to be considered, cannot take priority over families who have a statutory preference. The Conference Report expressly said that higher-income applicants should not have a priority. Yet this is precisely how the Montgomery Housing Authority is admittedly choosing tenants.
 
 
 49
 I find that the statute at issue here--42 U.S.C. Sec. 1437d(c)(4)(A)--is clear enough, when read in conjunction with its legislative history,[2] to provide adequate guidance to public housing authorities, even in the absence of interpretive regulations promulgated by HUD. Congress' intent was that economic mix not be a priority over preferences for families who live in substandard housing, who are homeless, or whose rent is over 50% of their incomes. Thus, regardless of whether the statutory preference provision is self-executing, the actions of the Montgomery Housing Authority reverse the statutorily mandated preferences and are in conflict with this statutory policy. See Martinez v. Rhode Island Housing & Mortgage Finance Corp., 738 F.2d 21, 25 (1st Cir.1984) (absolute preference for higher-income applicants violates statutory policy of Section 8 program, even though statute is not self-executing).
 
 
 50
 The record is clear with respect to the Montgomery Housing Authority's absolute preference for higher-income tenants. Indeed, the parties stipulated prior to trial that the Montgomery Housing Authority currently has a priority for renting to applicant families in the highest rent ranges, that to the extent preferences are given to families which are displaced or living in substandard housing, those preferences are only granted within rent ranges, and that there has never been a preference granted to those families which are paying over 50% of their income for rent. See Record on Appeal at 221, 222 (Pre-trial Stipulations, paragraphs 52, 57, and 61). Since I believe the district court erred in not finding this policy to be a statutory violation, I would reverse and grant plaintiffs relief from the tenant selection procedures being applied by the Montgomery Housing Authority.
 
 
 
 [1]
 42 U.S.C. Sec. 1983 (1982) provides in relevant part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 In their complaint, the appellants also alleged that the MHA's conduct, as described in the text infra Part III, denied them their fourteenth amendment right to due process of law and equal protection of the laws, violated the Housing Act, and abridged their rights as third-party beneficiaries of the Annual Contributions Contract between HUD and the MHA. The district court resolved these claims in favor of the MHA.
 
 
 [2]
 This provision further states as follows:
 Not more than 5 per centum of the dwelling units which become available for occupancy under public housing annual contributions contracts ... under [the Housing Act] on or after October 1, 1981, shall be available for leasing by lower income families other than very low-income families.
 42 U.S.C. Sec. 1437n(b) (1982). None of the dwelling units operated by the MHA became available after October 1, 1981; thus, the five percent ceiling is not at issue in this case.
 
 
 [3]
 Despite its failure to cross-appeal, the MHA, as appellee, is entitled to raise any argument on appeal that supports the judgment of the district court. United States v. American Ry. Express Co., 265 U.S. 425, 435-36, 44 S.Ct. 560, 564, 68 L.Ed. 1087 (1924); Trustees of the Atlanta Iron Workers, Local 387 Pension Fund v. Southern Stress Wire Corp., 724 F.2d 1458, 1459 (11th Cir.1983) (per curiam)
 
 
 [4]
 The rule that an appellate court need not address nonjurisdictional issues not raised by the parties is akin to the plain error rule, under which an appellate court will address plain errors committed by the district court even though the parties did not object at trial. See, e.g., Whiting v. Jackson State Univ., 616 F.2d 116, 126 (5th Cir.1980) (jury charge given without objection will not be reviewed "unless the error is so fundamental as to result in a miscarriage of justice"); Patton v. Archer, 590 F.2d 1319, 1322-23 (5th Cir.1979) (same)
 
 
 [5]
 These rent figures are calculated based on the Housing Act's guidelines:
 Dwelling units assisted under this chapter shall be rented only to families who are lower income families at the time of their initial occupancy of such units. Reviews of family income shall be made at least annually. A family shall pay as rent for a dwelling unit assisted under this chapter ... the highest of the following amounts, rounded to the nearest dollar:
 (1) 30 per centum of the family's monthly adjusted income;
 (2) 10 per centum of the family's monthly income; or
 (3) if the family is receiving payments for welfare assistance from a public agency and a part of such payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of such payments which is so designated.
 42 U.S.C. Sec. 1437a(a) (1982 & Supp. III 1985). Some families are entitled to zero or "negative" rent because HUD mandates utility reimbursements, see 24 C.F.R. Secs. 913.108, 960.208 (1986), and adjustments to income, see id. Sec. 913.102, which reduce their prescribed rent to zero or require that they receive net payments from the housing authority.
 
 
 [6]
 The court did discuss the testimony of MHA officials:
 In response to Plaintiffs' contention that the Defendants violate 24 C.F.R. Secs. 960.204(c) and 960.205(a) by categorically denying admission to families whose anticipated rent would be $20.00 or less, Ms. Elizabeth Griffin, supervisor for selection of tenants with the MHA, testified that, between January and May, 1985, six families, whose income is such that their rent would be $0 to $20.00 per month, have been admitted to housing in the MHA. She further testified that only during the 1982-83 fiscal year were families whose rent would have been in the $0 to $20.00 range excluded from housing and that this was the result of HUD's management informing the MHA that it housed more tenants than it needed in that very lowest rent range.
 ....
 Moreover, Mr. Kenneth Robertson testified that some 30 percent (737 out of 2200) of the families currently housed by the MHA are families whose income is such that their anticipated public housing rent would be zero or a negative amount. Based on the foregoing, Plaintiffs' complaints regarding the Defendants' alleged violation of 24 C.F.R. Secs. 960.204(c) and 960.205(a) are due to be dismissed.
 The testimony cited by the district court is incomplete. Although the MHA currently houses families who pay negative or zero rent, this fact does not prove that it admitted families during the relevant time period whose rent was in that range; because of changes in a family's economic situation, or modifications in the MHA's rent and utility calculations, these families may have been admitted when they were obligated to pay positive rents.
 As to families in the one to twenty dollar rent range, the court discussed testimony that six such families were admitted from January to May 1985, and that in response to a HUD directive, no family from this rent range was admitted during 1982 to 1983.
 
 
 [7]
 The HUD regulations applicable at that time provided as follows:
 (a) In addition to policies and regulations including preferences and priorities established by the [local housing authority] for eligibility and admission to its low-income housing projects pursuant to the Act and the ACC with respect thereto, each [local housing authority] shall adopt and implement policies and procedures embodying standards and criteria for tenant selection which take into consideration the needs of individual families for low-income housing and the statutory purpose in developing and operating socially and financially sound low-income housing projects which provide a decent home and a suitable living environment and foster economic and social diversity in the tenant body as a whole.
 (b) Such policies and procedures shall be designed to: (1) Avoid concentrations of the most economically and socially deprived families in any one or all of the [local housing authority's] low-income housing projects; (2) preclude admission of applicants whose habits and practices reasonably may be expected to have a detrimental effect on the tenants or the project environment; and (3) attain, within a reasonable period of time, a tenant body in each project composed of families with a broad range of incomes and rent-paying ability which is generally representative of the range of incomes of low-income families in the [local housing authority's] area of operation as defined in State law.
 (c) Such policies and procedures shall: (1) Not automatically deny admission to a particular group or category of otherwise eligible applicants (e.g., unwed mothers or families with children born out of wedlock); (2) assure that selection by the [local housing authority] among otherwise eligible applicants is objective and reasonable; (3) be consistent with the [local housing authority's] responsibilities as a public body; and (4) be in compliance with State, local and Federal laws and regulations, including the nondiscriminatory requirements of Title VI of the Civil Rights Act of 1964, and the provisions of the ACC.
 (d) Such policies and procedures shall: (1) Be duly adopted; (2) be publicized by posting copies thereof in each office where applications are received and by furnishing copies to applicants or tenants upon request; (3) be specific and describe in detail the criteria, standards and preferences to be applied; and (4) provide for verification and documentation of information relevant to acceptance or rejection of an applicant.
 
 
 [24]
 C.F.R. Sec. 860.204 (1980) (amended 1980, 1984 & 1985) (redesignated as 24 C.F.R. Sec. 960.204 (1986)); see also id. Sec. 860.205 (amended 1984 & 1985) (redesignated as 24 C.F.R. Sec. 960.205 (1986))
 
 
 [8]
 Except for the addition of a provision irrelevant to this case, see 24 C.F.R. Sec. 860.204(e) (1981) (amended 1984 & 1985) (redesignated as 24 C.F.R. Sec. 960.204(e) (1986)), the 1981 HUD regulations were identical to the pre-1979 regulations. See 24 C.F.R. Sec. 860.204(a)-(e) (1980) (amended 1984 & 1985) (redesignated as Sec. 960.204(a)-(e) (1986)); id. Sec. 860.205 (amended 1984 & 1985) (redesignated as Sec. 960.205 (1986))
 
 
 [9]
 On September 26, 1984, HUD issued proposed rules that would have implemented these preference provisions, see 49 Fed.Reg. 37,787 (1984) (proposed rule), but the preferences were not adopted in a final, binding HUD regulation
 
 
 [10]
 24 C.F.R. Sec. 960.204 (1986) provides as follows:
 (a) In addition to policies and regulations including preferences and priorities established by the [local housing authority] for eligibility and admission to its public housing projects pursuant to the Act and the ACC with respect thereto, each [local housing authority] shall adopt and implement policies and procedures embodying standards and criteria for tenant selection which take into consideration the needs of individual families for public housing and the statutory purpose in developing and operating socially and financially sound public housing projects which provide a decent home and a suitable living environment and foster economic and social diversity in the tenant body as a whole.
 (b) Such policies and procedures shall be designed to: (1) Avoid concentrations of the most economically and socially deprived families in any one or all of the [local housing authority's] public housing projects; (2) preclude admission of applicants whose habits and practices reasonably may be expected to have a detrimental effect on the tenants or the project environment; and (3) subject to the requirements and limitations of Part 913 of this chapter, attain, within a reasonable period of time, a tenant body in each project composed of families with a broad range of incomes and rent-paying ability that is generally representative of the range of incomes of lower income families in the [local housing authority's] area of operation, as defined in State law.
 (c) Such policies and procedures shall:
 (1) Not automatically deny admission to a particular group or category of otherwise eligible applicants (e.g., unwed mothers or families with children born out of wedlock);
 (2) Assure that selection by the [local housing authority] among otherwise eligible applicants is objective and reasonable;
 (3) Be consistent with the [local housing authority's] responsibilities as a public body; and
 (4) Be in compliance with State, local and Federal laws and regulations, including the nondiscrimination requirements of Title VI of the Civil Rights Act of 1964, and the provisions of the ACC.
 (d) Such policies and procedures shall:
 (1) Be duly adopted;
 (2) Be publicized by posting copies thereof in each office where applications are received and by furnishing copies to applicants or tenants upon request;
 (3) Be specific and describe in detail the criteria, standards and preferences to be applied; and
 (4) Provide for verification and documentation of information relevant to acceptance or rejection of an applicant.
 (e) Requirements or preferences for those living in the jurisdiction of the [local housing authority] at the time of application are permissible subject to the following: No requirement or preference may be based upon the identity or location of the housing which is occupied or proposed to be occupied by the applicant nor upon the length of time the applicant has resided in the jurisdiction; applicants who are working or who have been notified that they are hired to work in the jurisdiction shall be treated as residents of the jurisdiction.
 
 
 [24]
 C.F.R. Sec. 960.205 (1986) provides as follows:
 (a) The criteria to be established and information to be considered shall be reasonably related to individual attributes and behavior of an applicant and shall not be related to those which may be imputed to a particular group or category of persons of which an applicant may be a member. See, e.g., Sec. 960.204(c).
 (b) The criteria to be established in relation to avoiding concentration of families with serious social problems in [local housing authority] projects and information to be considered shall be reasonably related to whether the conduct of the applicant in present or prior housing has been such as would not be likely to interfere with other tenants in such a manner as to diminish their enjoyment of the premises by adversely affecting their health, safety or welfare or to affect adversely the physical environment or the financial stability of the project if the applicant were admitted to the project. Relevant information respecting habits or practices to be considered may include, but is not limited to:
 (1) An applicant's past performance in meeting financial obligations, especially rent;
 (2) A record of disturbance of neighbors, destruction of property, or living or housekeeping habits at prior residences which may adversely affect the health, safety or welfare of other tenants; and
 (3) A history of criminal activity involving crimes of physical violence to persons or property and other criminal acts which would adversely affect the health, safety or welfare of other tenants.
 (c) Subject to the requirements and limitations of Part 913 of this chapter, the criteria to be established shall be reasonably related to achieving the basic objective of attaining, within a reasonable period of time, a tenant body in each project composed of families with a broad range of income, generally representative of the range of income, and rent paying ability of lower income families in the [local housing authority's] area of operation, as defined in state law. To accomplish the objective [local housing authorities] shall:
 (1) Conduct studies, as necessary, directed to the distribution of incomes of all lower income families (elderly and nonelderly) in the [local housing authority's] area of operation, as defined in state law, based upon the most recent census or other reliable data on family income;
 (2) Ascertain the actual distribution of incomes of all tenant families in residence in the [local housing authority's] projects;
 (3) Ascertain the distribution of incomes of families on the [local housing authority's] waiting list;
 (4) Ascertain the average operating costs of the [local housing authority's] project or projects and the average rent required to meet such costs;
 (5) Ascertain the average rent which would be achieved based upon the incomes of lower income families in accordance with the distribution of incomes of all lower income families (elderly and nonelderly) in the [local housing authority's] area of operation, as defined in state law;
 (6) Ascertain the average rent which can be achieved based upon the income of families in tenancy in the [local housing authority's] project or projects;
 (7) Ascertain the average rent which could be achieved based upon the incomes of the families on the [local housing authority's] waiting list;
 (8) Utilizing the above information, develop criteria, by preference or otherwise, which will be reasonably calculated to attain the basic objective. The criteria developed shall be sufficiently flexible to assure administrative feasibility. A dwelling unit should not be allowed to remain vacant for the purpose of awaiting application by a family falling within the appropriate range.
 (d) In the event of the receipt of unfavorable information with respect to an applicant, consideration shall be given to the time, nature, and extent of the applicant's conduct and to factors which might indicate a reasonable probability of favorable future conduct or financial prospects. For example:
 (1) Evidence of rehabilitation;
 (2) Evidence of the applicant family's participation in or willingness to participate in social service or other appropriate counseling service programs and the availability of such programs;
 (3) Evidence of the applicant family's willingness to attempt to increase family income and the availability of training or employment programs in the locality.
 
 
 [11]
 The language in this provision can be contrasted with the mandatory language Congress used with regard to another housing program:
 Contracts to make assistance payments entered into by a public housing agency with an owner of existing housing units shall provide (with respect to any unit) that ... the selection of tenants for such unit shall be the function of the owner, subject to the provisions of the annual contributions contract between the Secretary and the agency, except that the tenant selection criteria used by the owner shall give preference to families which occupy substandard housing, are paying more than 50 per centum of family income for rent, or are involuntarily displaced at the time they are seeking assistance under this section....
 42 U.S.C. Sec. 1437f(d)(1)(A) (1982 & Supp. III 1985) (emphasis added). Although Congress included mandatory language in section 1437f(d)(1)(A), it did not use the same language in section 1437d(c)(4)(A). Rather, it required local housing authorities to "comply with such procedures and requirements as the Secretary may prescribe." Id. Sec. 1437d(c)(4)(A) (emphasis added). We must give this permissive language its plain meaning, particularly in light of Congress' express use of mandatory language in a parallel provision of the Housing Act.
 In dissenting on this point, Judge Anderson relies on the legislative history of the 1979 amendments to the Housing Act to support his position that local housing authorities must comply with the preference provisions even if HUD has not promulgated implementing regulations. Nothing in the legislative history cited by Judge Anderson undermines the clear language of the statute. Rather, the legislative history simply explains the preference provisions and provides general guidance to HUD for implementation of those provisions. See H.R.Rep. No. 154, 96th Cong., 1st Sess. 16, reprinted in 1979 U.S.Code Cong. & Ad.News 2317, 2332.
 Moreover, we cannot agree with Judge Anderson's statement that "regardless of whether the statutory preference provision is self-executing, the actions of the Montgomery Housing Authority reverse the statutorily mandated preferences and are in conflict with this statutory policy." (emphasis added). Our view is that local housing authorities are bound only by a self-executing statute or by a final regulation issued by HUD pursuant to an authorizing statute; in other words, local housing authorities are not bound by a statutory provision that is not self-executing unless HUD has promulgated regulations. Any other approach would disrupt the complex statutory scheme Congress created in the Housing Act, leading to uncertainty on the part of local housing authorities concerning their obligations under the Act.
 To the extent that Martinez v. Rhode Island Hous. & Mortgage Fin. Corp., 738 F.2d 21, 22-26 (1st Cir.1984) (provision of Housing Act that is not self-executing is still binding on state housing agency despite absence of HUD implementing regulations pursuant to analogous housing program), is inconsistent with our holding, we disagree with the First Circuit's discussion of statutory interpretation. We note, however, that 42 U.S.C. Sec. 1437n (1982 & Supp. III 1985), the provision interpreted in Martinez, contains mandatory language that cannot be found in section 1437d(c)(4)(A). Contrary to the Martinez court, see Martinez, 738 F.2d at 25, we view section 1437n as self-executing because of the presence of mandatory language in that provision. See generally infra Part III. D. (applying section 1437n).
 
 
 [12]
 Between 1981 and the effective date of the 1983 amendments to the Housing Act, this provision set a 10 percent ceiling instead of a 25 percent ceiling. See 42 U.S.C. Sec. 1437n(a) (1982) (amended 1983)
 
 
 [13]
 The district court stated as follows:
 In response to Plaintiffs' contentions that Defendants violate 42 U.S.C. Sec. 1437n, Mr. Kenneth Robertson, comptroller of the MHA, testified that, upon review of the MHA's records from 1981 to 1984, he found that over 90 percent of the tenants who were admitted during that time to housing by the MHA fell within the definition of "very low income family". He testified that the 1985 total tenant population showed that approximately 99 percent of the tenants fell within the definition of "very low income family". The percentages for earlier years were as follows: 1981, about 90 percent; 1982, 90 percent; 1983, 99 percent; 1984, 98.28 percent. On May 22, 1985, of the 2,635 families housed by MHA, 909 or 34 percent were scheduled to pay rent of less than $20.00 a month and 722 or 27 percent were to pay no rent or were paid to live in a project. Therefore, it appears that the MHA complied with the requirements of 42 U.S.C. Sec. 1437n(a), both before and after the 1983 amendment and that Plaintiffs are entitled to no relief therefor.
 
 
 [14]
 The appellants also contend that the evidence upon which the district court based its finding of MHA's compliance with section 1437n(a) is unreliable for two reasons. First, they note that the data do not include families who moved out of MHA housing before the income figures were calculated, i.e., only families who continue to reside in MHA housing were included in the data because information on families who have moved out of the housing projects is not maintained on the MHA's computer. Second, they contend that the data were based on adjusted income, rather than total income, thus underestimating the income of families the MHA admitted and probably decreasing the percentage of families other than very low-income families. See 24 C.F.R. Sec. 913.102 (1986) (definition of very low-income family based on "Annual Income"). Compare id. Sec. 913.106 (1986) (definition of "Annual Income") with 42 U.S.C. Sec. 1437a(b)(5) (1982 & Supp. III 1985) (definition of "adjusted income")
 Although both of these contentions have some merit, we do not believe that they rendered the data unreliable. Our review of the record indicates that neither the failure to include in the analysis families no longer housed by the MHA, nor the use of adjusted rather than total income figures, completely vitiated the probative value of the data. Moreover, the appellants incorrectly argue that the MHA had the burden of proving compliance with section 1437n(a) because it affirmatively stated, in its answer, that it complied with this provision. Rather, the appellants had the burden of proving a violation of section 1437n(a) as one element of their section 1983 claim, and had the opportunity to obtain rebuttal evidence from the MHA's files in this regard. Thus, the district court's conclusion that the appellants failed to meet their burden of proof is not clearly erroneous.
 
 
 [1]
 See 42 U.S.C. Sec. 1437d(c)(4)(A) (1982 & Supp. III 1985)
 
 
 [2]
 The legislative history accompanying the 1979 Amendment which added two of the preferences strongly suggests that Congress intended for its own statute to guide public housing authorities and that it did not mean for the preferences to have no effect until HUD promulgated regulations. "The Committee has provided a priority in the selection of tenants in public housing ... The priority is intended to guide the ... PHA in determining which potential tenants to select." H.R.Rep. No. 154, 96th Cong., 1st Sess. 16, reprinted in 1979 U.S.Code Cong. & Ad.News 2317, 2332