**Joseph MARTINEZ, et al.,
Plaintiffs, Appellees,**

v.

**RHODE ISLAND HOUSING AND MORTGAGE FINANCE CORPORATION, et al., Defendants, Appellants.**

**Nos. 83–1849, 84–1075.**

United States Court of Appeals,
First Circuit.

Argued April 5, 1984.

Decided June 27, 1984.

Jeffrey C. Schreck, Providence, R.I., with whom William P. Robinson III, John A. Houlihan, Michael DiBiase, and Edwards & Angell, Providence, R.I., were on brief, for Rhode Island Housing and Mortgage Finance Corp.

John W. Dineen, Providence, R.I., with whom Michael V. Milito, Providence, R.I., was on brief, for Joseph Martinez, et al.

Before CAMPBELL, Chief Judge, COFFIN, Circuit Judge, and BONSAL,* Senior District Judge.

LEVIN H. CAMPBELL, Chief Judge.

This is an appeal by the Rhode Island Housing and Mortgage Finance Corporation ("RIHMFC" or "Corporation") from a preliminary injunction entered by the United States District Court for the District of Rhode Island.

Plaintiffs below are a putative class of all "very low-income" present and future applicants for federally funded low income housing in Rhode Island. They are challenging tenant selection procedures prescribed by RIHMFC pursuant to its authority under the United States Housing Act (the "Act"), 42 U.S.C. § 1437 *et seq.* Plaintiffs particularly attack RIHMFC's "income mix" requirements under which qualified applicants for subsidized housing are culled on the basis of income. For example, one member of the plaintiff class, Claudette Hunt, alleged that she was placed on the waiting list for a subsidized housing project in January 1979, but because of her low income, was repeatedly passed over in favor of later but higher income applicants. She was still on the waiting list as of September 1983.

## I.

To understand this appeal it is necessary to review the tangled history of relevant parts of the Act and regulations. The Act's policy is to employ federal funds to assist the states in providing "decent, safe, and sanitary dwellings for families of lower income." 42 U.S.C. § 1437. Formerly, section 8 of the Act provided for federally funded rental assistance payments to "owners or prospective owners who agree to construct or substantially rehabilitate housing in which some or all of the units shall be available for occupancy by lower-income families." 42 U.S.C. § 1437f(b)(2) (repealed).[1] Prior to the 1981 amendments to the Act, section 8 stated,

> (7) At least 30 per centum of the families assisted under this section with annual allocations of contract authority shall be very low income families at the time of the initial renting of dwelling units.

42 U.S.C. § 1437f(c)(7) (repealed).[2] The Act defines two classes of families qualifying for assistance under section 8:

---

* Of the Southern District of New York, sitting by designation.

1. This "new construction" program was enacted by the Housing and Community Development Act of 1974, Pub.L. No. 93–383, § 201(a), 88 Stat. 633, 662. The program was repealed by the Housing and Urban-Rural Recovery Act of 1983, Pub.L. No. 98–181, § 209, 97 Stat. 1155, 1183, with the proviso that the program's provisions remain in effect "with respect to any funds obligated for a viable project under section 8 of the United States Housing Act of 1937 prior to January 1, 1984."

2. This language was enacted by the Housing and Community Development Act of 1974; Pub.L. No. 93–383, § 201(a), 88 Stat. 633, 662.

The term "lower income families" means those families whose incomes do not exceed 80 per centum of the median income for the area, as determined by the Secretary with adjustments for smaller and larger families .... The term "very low-income families" means lower income families whose incomes do not exceed 50 per centum of the median income for the area, as determined by the Secretary with adjustments for smaller and larger families ....

42 U.S.C. § 1437a(b).

The Department of Housing and Urban Development ("HUD"), in implementing the former section 1437f(b)(2), established parallel programs for rental assistance under which owners of newly constructed housing could obtain contracts for assistance payments either from HUD directly or from state housing agencies. The regulations governing direct HUD assistance contracts imposed an income mix requirement in response to the former section 1437f(c)(7) and the section 1437f(a) policy "of promoting economically mixed housing":

> (c) *Income Mix.* In the initial renting of assisted units, the owner must lease at least 30 percent of the assisted units to very low-income families. After initial renting, the owner must use his best efforts to maintain at least 30 percent occupancy by very low-income families. In addition, at all times, the owner will use his best efforts to achieve leasing to families with a range of incomes so that the average of incomes of all families in occupancy is at or above 40 percent of the median income in the area.

24 C.F.R. § 880.603(c). Similarly, the HUD regulations covering state agency assistance contracts mandated an income mix:

> (c) *Income Mix.* In the initial renting of assisted units, the Agency must be able to verify to HUD that at least 30 percent of the units assisted under its program are leased to very low-income

families. After initial renting, the Agency must be able to verify to HUD that owners use their best efforts to maintain at least 30 percent occupancy by very low-income families under the Agency's program. In addition, the Agency will use its best efforts to achieve leasing by owners to families with a range of incomes so that the average incomes of all families in occupancy is at or above 40 percent of the median income in the area.

24 C.F.R. § 883.704(c).

To implement the income mix policy, RIHMFC included a term in its assistance contracts with owners providing,

> To meet the Rhode Island Housing and Mortgage Finance Corporation (RIHMFC) requirements of the Section 8 Housing Assistance Payments Program, a minimum of 30% and a maximum of 35% (60% maximum for elderly projects) of the assisted units will be rented to persons of "very low income" as defined by HUD. The balance of assisted units will be rented to persons of "low income" as defined by HUD.

The above-described section 8 program was significantly altered by the Omnibus Budget Reconciliation Act of 1981 ("OBRA"), Pub.L. No. 97–35, § 322 *et seq.*, 95 Stat. 357, 400. The OBRA amendments repealed section 1437f(c)(7) as quoted above, and they changed the income eligibility requirements for section 8 assistance. The new requirements, in new section 1437n, read as follows:

> (a) Not more than 10 per centum [3] of the dwelling units which were available for occupancy under public housing annual contributions contracts and section 8 [42 U.S.C.A. § 1437f] housing assistance payments contracts under this chapter before Oct. 1, 1981, and which will be leased on or after such effective date shall be available for leasing by lower income families other than very low-income families.

**3.** This percentage was subsequently increased to 25 in 1983. Pub.L. No. 98–181, § 213, 97 Stat.

1184.

(b) Not more than 5 per centum of the dwelling units which become available for occupancy under public housing annual contributions contracts and section 8 [42 U.S.C.A. § 1437f] housing assistance payments contracts under this chapter on or after Oct. 1, 1981, shall be available for leasing by lower income families other than very low-income families.

Despite the October 1, 1981 effective date of the OBRA amendments, HUD has not yet promulgated new regulations implementing the changed income eligibility provisions. RIHMFC is continuing to enforce its own income mix requirements, and plaintiffs challenge its right to do so.

Plaintiffs initially sought a temporary restraining order requiring RIHMFC to apply the new income eligibility percentages of section 1437n to each housing project receiving assistance from the Corporation. The district court rejected this request on the ground that section 1437n appears to set only national standards, which might not apply to each individual housing project. Since the standards are apparently not self-executing, but rather require implementing regulations, the district court concluded that plaintiffs had failed to demonstrate a likelihood of success on the merits so as to warrant temporary relief. Plaintiffs have not appealed from that ruling.

Plaintiffs then sought a temporary restraining order prohibiting RIHMFC from enforcing its requirement that no more than 35 percent of assisted units be rented to very low income families. They also sought to compel RIHMFC to notify project owners that they are not permitted to consider relative incomes in selecting between low income applicants for assisted housing. The district court granted the requested temporary restraining order on September 26, 1983. The order provided,

1. RIHMFC shall delete from its resident selection and marketing plan all reference to a maximum quota on the number of persons or families in the "very low income" (i.e., income less than 50% of the area median income) range and make no use of said quota in the renting of any Section 8 unit after September 27, 1983.

2. RIHMFC shall communicate with the appropriate management and tenant selection personnel of all state agency Section 8 projects in Rhode Island including those currently proceeding with rent-up and advise such personnel that the RIHMFC quota referred to in paragraph 1, above, has been enjoined by Order of this Court and is of no effect.

3. RIHMFC shall further advise such personnel that they are prohibited from complying with the maximum quota referred to in paragraph 1, above, and that they may not give a preference or priority to any person or family solely on the basis that such person's or family's income is higher than any other person's or family's income.

On October 3, 1983, RIHMFC filed an affidavit of compliance with the notification requirements of the restraining order. The first paragraph of the order was subsequently entered as a preliminary injunction on October 17, 1983. An order prohibiting RIHMFC from rescinding the notification given in accord with paragraph 3 of the restraining order was incorporated into the preliminary injunction on December 22, 1983. RIHMFC has limited its appeal to this latter portion of the preliminary injunction.

## II.

The standards for granting a preliminary injunction are well settled:

In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009

(1st Cir.1981) (quoting *Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542, 544 (D.Me.1979)). We review a district court's grant of a preliminary injunction only for abuse of discretion. *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d at 1009. RIHMFC argues that plaintiffs have not demonstrated a likelihood of success on the merits with respect to the practice of favoring applicants with higher incomes. We disagree.

The OBRA amendments and the accompanying legislative history evince a congressional intent against preferences for higher income applicants for section 8 housing. While we agree with the district court that the new minimum requirements of 75 percent very low income tenants in existing units and 95 percent very low income tenants in new units are not self-executing, they plainly demonstrate Congress's desire to focus the section 8 program on very low income families. To continue to grant a preference to low income applicants over very low income applicants is at odds with this statutory policy. The legislative history of the OBRA amendments contains a very explicit statement that "families whose incomes are between 50 and 80 percent of median [low income families] not be given a priority for occupancy by virtue of their income."[4]

In arguing that it has a right, indeed a duty, to accord priority to families with higher incomes, RIHMFC points to the stated purposes of the section 8 program:

For the purpose of aiding lower-income families in obtaining a decent place to live and of *promoting economically mixed housing,* assistance payments may be made with respect to existing housing in accordance with the provisions of this section.

42 U.S.C. § 1437f(a) (emphasis added). RIHMFC deduces from this language a requirement, or at least an authorization, that priority be given to applicants with higher incomes. Such an interpretation is, however, belied by both the lower income quotas fixed in the 1981 amendments themselves and the legislative history already referred to. *See* note 4. We are unable to read the purpose of section 8 in a way directly contrary to these clear legislative expressions.

RIHMFC also cites to the income mix provision of section 1437d:

(4) the public housing agency shall comply with such procedures and requirements as the Secretary may prescribe ... including requirements pertaining to—

(A) ... the establishment of tenant selection criteria ... which is [sic] designed to assure that, within a reasonable period of time, the project will include families with a broad range of incomes and will avoid concentrations of lower income and deprived families with serious social problems ....

42 U.S.C. § 1437d(c)(4). This section is not, however, applicable to the section 8 program:

Sections 1437c(e) and 1437d of this title, and any other provisions of this chapter which are inconsistent with the provisions of this section shall not apply to contracts for assistance entered under this section.

42 U.S.C. § 1437f(h).

Finally, RIHMFC points to the unrevoked HUD income mix regulation, *supra,* which requires that each state housing agency "will use its best efforts to achieve leasing by owners to families with a range of incomes so that the average income of all families in occupancy is at or above 40

---

4. The relevant passage from the conference report states,

[G]iven the changes in income eligibility required by this conference report, the conferees direct the Secretary of HUD to rescind the cited regulation [24 C.F.R. § 880.603(c)]. The conferees are also concerned that in carrying out the policy of creating a mix of

families having a broad range of lower incomes in assisted housing that families whose incomes are between 50 and 80 percent of median not be given a priority for occupancy by virtue of their income.

H.R.Rep. No. 208, 97th Cong., 1st Sess. 695, *reprinted in* 1981 U.S.Code Cong. & Ad.News 396, 1010, 1054.

percent of the median income in the area." 24 C.F.R. § 883.704(c). Noting that the congressional conference committee ordered the Secretary of HUD to rescind the nearly identical regulation applicable to individual owners, 24 C.F.R. § 880.603, *see supra* note 4, the Corporation argues that such an explicit directive would also be necessary to invalidate the regulation applicable to state housing agencies. HUD has yet to rescind either of the regulations. RIHMFC concludes therefore that it can properly rely on the income mix regulation in ordering a high income priority.

This contention has some force in that state agencies are supposed to conform to HUD-imposed provisions when contracting with individual owners. 42 U.S.C. § 1437f(d)(1)(A). The Secretary's tardiness in developing new regulations implementing the 1981 amendments thus leaves RIHMFC in an uneasy position. Nonetheless, we think the district court was reasonable to conclude that the tenor of the 1981 amendments, as well as the conference committee's flat disapproval of giving families "a priority for occupancy by virtue of their income," ruled out tenant selection policies of the kind it enjoined in the third part of its injunction. Since "a rule out of harmony with the statute, is a mere nullity," *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936), RIHMFC cannot find refuge in a HUD regulation that, while not officially rescinded, appears now to be totally at odds with current statutory law. We therefore conclude that the district court did not abuse its discretion in granting the challenged preliminary relief.

While based on the present record we uphold the injunction, we are concerned by the fact that HUD, the agency with expertise in the administration of section 8, did not participate in the proceedings. The Secretary of HUD was named as a party defendant on October 7, 1983, but has not provided any input into the decision concerning the preliminary injunction. Nor has HUD participated in the instant appeal. We think HUD's views are important—indeed, as the federal agency charged with administering the statute, HUD's views would, as a practical matter, seem essential. We also think the district court may wish to reevaluate the preliminary injunction in light of the subsequent repeal of the section 1437f(b)(2) "new construction" program on November 30, 1983. The parties have not addressed the effect of the repeal, and we express no opinion as to its consequences. The injunction states that,

> This preliminary injunction is subject to modification which may be sought by any party in light of new developments in the governing legislation or regulations promulgated by the United States Department of Housing and Urban Development.

Accordingly, while upholding the preliminary injunction for the present, we direct the district court to order HUD to file a supplemental brief stating the Secretary's position with respect to this injunction and the underlying issues; and we further direct the court to solicit the views of HUD and of the parties on the effect of the recent repeal of section 1437f(b)(2) and on any other relevant issue. The court should then either continue its injunction in effect or modify or revoke it, as it deems proper.

*Affirmed.*