**Ginger PRUTICKA, Plaintiff,**

v.

**Charles POSNER, Defendant.**

Civ. A. No. 88–2328.

United States District Court,
D. New Jersey.

Feb. 23, 1989.

As Amended June 9, 1989.

Gregory G. Diebold, Hudson County Legal Services Corp., Timothy K. Madden, Director, Jersey City, N.J., for plaintiff.

J. Everett Mounts, John D. Onnembo, Jr., Fitzpatrick & Israels, Secaucus, N.J., for defendant.

## OPINION

WOLIN, District Judge.

This is an action pursuant to 42 U.S.C. § 1983 for alleged violation of plaintiff's asserted right to a public housing preference. Before the Court are plaintiff's and defendant's cross-motions for summary judgment. The Court will deny the cross-motions.

## BACKGROUND

On January 4, 1986, plaintiff Ginger Pruticka filed an application for public housing with the Bayonne Housing Authority ("BHA"), of which defendant Charles Posner is the Executive Director. She had recently become estranged from her husband John Pruticka and was living sometimes with relatives and sometimes out of a car. Although defendant has offered evidence that plaintiff's husband had custody of their daughter Lisa at the time, plaintiff alleges that she in fact had custody of Lisa at the time or alternatively, that she would have been able to obtain custody of Lisa had she been afforded public housing.

The copy of the January 4, 1986 application submitted to the Court lists plaintiff's daughters Lisa and Amanda as persons who would live with plaintiff in the public housing. Since Amanda was not born until January 7, 1988, plaintiff admits that she must have added Amanda's name after the filing of the application. It is not clear, however, whether Lisa's name was on the application at the time that it was submitted. It is undisputed that plaintiff did not receive a written response from the BHA with respect to her application of January 4, 1986.

On July 30, 1987, plaintiff filed another application with the BHA, in which she applied for housing for herself only. On that application Pruticka listed her monthly income as $210 and her monthly rent as $525. She stated that she was about to be without housing because of her inability to afford the rent. Again, there is dispute as to whether or not plaintiff had custody of Lisa at the time of the second application. Although the BHA initially declined this second request for housing, it is undisputed that after Amanda's birth some six months following the submission of the July 1987 application the BHA did make an offer of Section 8 existing housing assistance to plaintiff. This offer plaintiff declined. Thereafter she brought the instant action for declaratory and injunctive relief, damages and attorney's fees. Subsequently plaintiff accepted an offer of housing from the BHA. The instant action has proceeded on plaintiff's claim for damages.

## DISCUSSION

The statute under which plaintiff has brought suit, 42 U.S.C. § 1983, provides in part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Plaintiff claims two grounds on which she was allegedly deprived of "rights, privileges, or immunities" secured by the Constitution and laws of the United States, the first of which is based on the United States Housing Act of 1937 ("Housing Act"), as amended and codified in part at 42 U.S.C. §§ 1437–1437j, and the second of which is based on that Act in conjunction with the Due Process Clause of the Fourteenth Amendment. Pruticka alleges a direct violation of the Housing Act because of defendant's failure to grant her a housing preference despite her homelessness at the time of her January 1986 application and the fact that she paid more than 50% of her income to rent as of her July 1987 application. For her asserted due process violation, plaintiff alleges that she had a property right under the BHA's own tenant selection criteria enacted pursuant to the Housing Act and 24 C.F.R. § 960.204 and that she was not granted a hearing before or after defendant's denial of her request. It is important to note that the first asserted ground for relief under § 1983 does not depend on the Due Process Clause but relies directly on the alleged violation of plaintiff's statutory rights. Therefore, whether an appropriate hearing was held is of no issue to the first asserted basis for relief, although it is of issue to the second asserted basis.

I. *Plaintiff's Rights Under the Housing Act Directly*

As explained and expanded by Congress in 1974, the Housing Act was enacted "to assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income." Housing and Community Development Act of 1974, Pub.L. No. 93–383, § 201(a), 88 Stat. 653 (codified at 42 U.S.C. § 1437). In furtherance of these goals, the Act authorizes the Department of Housing and Urban Development ("HUD") to provide low interest loans, grants and other assistance for the construction and operation of housing for families with low incomes. 42 U.S.C. § 1437b. In return, housing author-

ities such as the BHA must comply with statutes and regulations governing public housing. *See, e.g., Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 277–78, 89 S.Ct. 518, 523–24, 21 L.Ed.2d 474 (1969).

Congress amended the Act in 1974 to require that public housing authorities consider "economic mix" in the selection of tenants. Housing and Community Development Act of 1974, *supra* (codified at 42 U.S.C. § 1437d(c)(4)(A)). Under a 1979 amendment, Congress established two "preferences": one for families occupying substandard housing; another for families that had been involuntarily displaced. Housing and Community Development Amendments of 1979, Pub.L. No. 96–153, § 206(a), 93 Stat. 1108 (codified at 42 U.S.C. § 1437d(c)(4)(A)). In 1981, in the face of the budget cuts early in the Reagan Administration, Congress amended the Housing Act to focus limited federal resources on the neediest of families—*i.e.,* those of "very low income." Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, § 323, 95 Stat. 404 (codified at 42 U.S.C. § 1437n); *see* S.Rep. No. 139, 97th Cong., 1st Sess. 229–30, *reprinted in* 1981 U.S. Code Cong. & Admin.News 396, 525–26. Two years later, in 1983, Congress added a third "preference," which favors families that pay more than 50 percent of their income on rent. Domestic Housing and International Recovery and Financial Stability Act, Pub.L. No. 98–181, § 203(a), 97 Stat. 1153, 1178. *See generally Gholston v. Housing Authority of Montgomery,* 818 F.2d 776, 778–79 (11th Cir.1987); *id.* at 789 (Anderson, J., concurring in part and dissenting in part). Thus, in its present state, as codified at 42 U.S.C. § 1437d(c)(4)(A), the Housing Act provides that contracts between HUD and every public housing agency must provide that

> the public housing agency shall comply with such procedures and requirements as the Secretary may prescribe to assure that sound management practices will be followed in the operation of the project,

including requirements pertaining to ... the establishment of tenant selection criteria which gives [sic] preference to families which occupy substandard housing, are paying more than 50 percent of family income for rent, or are involuntarily displaced at the time they are seeking assistance under this chapter and which is [sic] designed to assure that, within a reasonable period of time, the project will include families with a broad range of incomes and will avoid concentrations of lower income and deprived families with serious social problems....

In the case at bar, plaintiff alleges that defendant denied her a preference in violation of the above-quoted statute.

■ A preliminary issue that the Court must address is whether a violation of the Housing Act is actionable at all under § 1983. As a general principle, § 1983 is available to enforce violations of Acts of Congress by agents of a State. *Maine v. Thiboutot,* 448 U.S. 1, 4–8, 100 S.Ct. 2502, 2504–06, 65 L.Ed.2d 555 (1980). Yet such relief is precluded where Congress explicitly forecloses it or does so implicitly by establishing a comprehensive remedial scheme for the enforcement of a statute. *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981). The Supreme Court recently held that the Brooke Amendment to the Housing Act, Pub.L. No. 91–152, § 213, 83 Stat. 389 (codified at 42 U.S.C. § 1437a), is actionable under § 1983.[1] *Wright v. City of Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 423–431, 107 S.Ct. 766, 771–74, 93 L.Ed.2d 781 (1987). In so holding, the Court noted that HUD has broad supervisory power over local public housing agencies, but found insufficient evidence that " 'the remedial devices provided in [*the Housing Act*] are sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983.' " *Id.* at 423, 107 S.Ct. at

---

1. The Brooke Amendment imposed a ceiling for rents charged to low-income persons living in public housing. In its current version the Amendment requires a low-income family living in public housing to pay a certain percentage of its income as rent. 42 U.S.C. § 1437a; *see Wright,* 479 U.S. at 419, 107 S.Ct. at 769.

771 (emphasis added) (bracketed material and ellipses in original) (quoting *National Sea Clammers*, 453 U.S. at 20, 101 S.Ct. at 2626). The Court went on to compare the Brooke Amendment and the Housing Act as a whole with the statutes at issue in *National Sea Clammers* and *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 104 S.Ct. 3457 (1984). Although the Court had held that a § 1983 action was precluded in the latter two cases, the *Wright* Court noted that

> the statutes at issue themselves [in those cases] provided for private judicial remedies, thereby evidencing congressional intent to supplant the § 1983 remedy. There is nothing of that kind found in the Brooke Amendment *or elsewhere in the Housing Act.* Indeed, the only private remedy provided for is the local grievance procedures which the Act now requires.... [But] the existence of a state administrative remedy does not ordinarily foreclose resort to § 1983.
>
> [R]espondents rely on HUD's authority to audit, enforce annual contributions contracts, and cut off federal funds. But these generalized powers are insufficient to indicate a congressional intention to foreclose § 1983 remedies.... There are no other mechanisms provided to enable HUD to effectively oversee the performance of the some 3,000 local [public housing agencies] across the country.

479 U.S. at 430, 107 S.Ct. at 773 (emphasis added) (footnotes and citations omitted). The above quotation clearly indicates that the *Wright* Court's ruling with respect to the Brooke Amendment applies with equal force to the Housing Act in general, and in particular, 42 U.S.C. § 1437d(c)(4)(A). *Gholston v. Housing Authority of Montgomery*, 818 F.2d 776, 780 (11th Cir.1987); *Samuels v. District of Columbia*, 770 F.2d 184, 194–96 (D.C.Cir.1985).

A second exception to the enforceability of a federal statute under § 1983 is if the statute does not create any specific, definable rights. *Wright*, 479 U.S. at 431–432, 107 S.Ct. at 774–75; *see Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 18, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981). Defendant argues that the preferences discussed in § 1437d(c)(4)(A) are merely advisory and not mandatory. In support of this argument, defendant focuses on the language of the statute, which—although mandatory in the sense that it provides that "the public housing agency *shall* comply ..."—is assertedly advisory in the sense that what the agency must comply with is "such procedures and requirements as the Secretary [of HUD] *may* prescribe," including tenant selection criteria. *Id.* (emphasis added). Although HUD proposed regulations on September 26, 1984, it was not until January 15, 1988 —seven years after the 1981 policy declaration by Congress; five years after the addition of the last preference; and over two years after Pruticka's first application for housing—that HUD promulgated a final regulation implementing the statutory preferences. 53 Fed.Reg. 1122 (1988) (codified at 24 C.F.R. § 215.22). This regulation did not take full effect until July 13, 1988. Posner argues that he could not have violated any right of plaintiff in denying her a preference because the HUD regulation was not binding on the Bayonne Housing Authority until long after the filing of plaintiff's two applications for housing.

Although the Third Circuit has not reached the issue, two other circuit courts have addressed the question of whether the congressional preferences embodied in the various amendments to the Housing Act were binding on public housing agencies before HUD's issuance of regulations implementing the statutory preferences. In *Martinez v. Rhode Island Housing and Mortgage Finance Corporation*, 738 F.2d 21 (1st Cir.1984), the First Circuit held that with respect to similar provisions in § 8 of the Act, Congress had clearly expressed a desire to focus the § 8 program on "very low income" families. In response to the Agency's argument that it was justified in relying on and following regulations that had been promulgated under the statute prior to its amendment, the court held that "[t]o continue to grant a preference to low income applicants over very low income applicants is at odds with this statutory policy." *Id.* at 25. Although acknowl-

edging that the Secretary's "tardiness" in developing regulations to implement the 1981 amendments put the housing authority in an awkward position, the court bowed to the principle expressed in *Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936), that "a rule out of harmony with the statute, is a mere nullity." 738 F.2d at 26. Thus defendant "cannot find refuge in a HUD regulation that, while not officially rescinded, appears now to be totally at odds with current statutory law." *Id.*

In an unreported case pertaining to § 8 housing preferences, this Court, per Judge Debevoise, held the statutory preferences of 42 U.S.C. § 1437f(d)(1) to be binding even in the absence of the long-awaited implementing regulations. *Moya v. Board of Commissioners,* Civ. No. 86–1994, transcript of oral opinion, at 5–8 (D.N.J. Feb. 24, 1987).

In contrast to *Martinez* and *Moya* is the Eleventh Circuit's opinion in *Gholston, supra,* which held that the provisions of 42 U.S.C. § 1437d(c)(4)(A) are not self-executing and that local housing authorities are thus not required to grant preferences before the issuance of final HUD regulations. 818 F.2d at 784–86. The *Gholston* court relied on the express language of the statute, as discussed above, and found nothing to the contrary in the legislative history. *Id.* at 785–86. The Eleventh Circuit, though stating its disagreement with the *Martinez* ruling, nevertheless took pains to distinguish that case on the ground that, although it found § 1437d(c)(4)(A) to be not self-executing, it viewed § 1437n (at issue in *Martinez*) as self-executing because that section contained mandatory language not present in § 1437d(c)(4)(A). *See* 818 F.2d at 786 n. 11. In contrast, the *Martinez* court had found § 1437n not to be self-executing. *See* 738 F.2d at 25.

In a separate opinion concurring in part but dissenting from the majority's ruling on § 1437d(c)(4)(A), Judge Anderson relied on legislative history to conclude that Congress had intended local agencies to implement the preferences even before the issuance of final HUD regulations. Specifically, Judge Anderson focused on a proposed amendment to the Housing Act voted by the Senate in 1981 that would have eliminated the "economic mix" requirement altogether on the ground that it had the effect of keeping public housing away from the truly needy; this amendment would have left intact the three preferences discussed above. S.Rep. No. 139, 97th Cong., 1st Sess. 235, 255, *reprinted in* 1981 U.S. Code Cong. & Admin.News 396, 531, 551; *see* 818 F.2d at 789. Although the House–Senate Conference Committee did not adopt the Senate's proposal, it did acknowledge that the economic mix criterion was being applied with unjust and unintended results:

> The conferees are … concerned that in carrying out the policy of creating a mix of families having a broad range of lower incomes in assisted housing that [sic] families whose incomes are between 50 and 80 percent of median not be given a priority for occupancy by virtue of their income. In addition, the conferees do not intend that a community should be required to achieve the same distribution of incomes between lower income families living in assisted housing and lower income families living in the community at large. Such a rigid formula can inhibit a community from fulfilling the basic purpose of the assisted housing programs without delay—to aid lower income families in obtaining a decent place to live.

H.R. Conf.Rep. No. 208, 97th Cong., 1st Sess. 695, *reprinted in* 1981 U.S.Code Cong. & Admin.News 1010, 1054, *quoted in Gholston,* 818 F.2d at 790. In light of this language, Judge Anderson concluded that "the 'economic mix' factor, while still a criteria to be considered, cannot take priority over families who have a statutory preference." 818 F.2d at 790. Judge Anderson reasoned that § 1437d(c)(4)(A)

> is clear enough, when read in conjunction with its legislative history, to provide adequate guidance to public housing authorities, even in the absence of interpretive regulations promulgated by HUD. Congress' intent was that economic mix

not be a priority over preference for families who live in substandard housing, who are homeless, or whose rent is over 50% of their incomes. Thus, regardless of whether the statutory preference provision is self-executing, the actions of the [local agency] reverse the statutorily mandated preferences and are in conflict with this statutory policy.

*Id.* (footnote omitted).

This Court concurs with the rationale of Judge Anderson in *Gholston*. In enacting the language favoring very low-income applicants in 1981, and adding in 1983 the language favoring applicants who are spending more than 50% of their income on rent, Congress clearly expressed its desire that applicants who are spending more than 50% of their income on rent be given a preference for public housing. Congress expected the Secretary of HUD to enact the regulations anticipated by § 1437d(c)(4)(A). Given the urgency of the problem for such applicants, Congress clearly could not have expected the Secretary to tarry so long in fleshing out the congressional objectives. Although this Court, like the *Martinez* court, recognizes that a federal agency's failure to act on a clear congressional mandate may place a local public housing authority in a difficult position, the unacceptable alternative is to allow local authorities to be accomplices in a federal agency's abdication of its responsibilities. The Court need not decide at what point the local authority's obligation to implement congressional objectives in the absence of agency guidance sets in. It is clear, however, that the BHA had such an obligation in the case at bar, where Congress' legislation had languished without implementation for several years. Thus the Court will deny defendant's motion for summary judgment. It is possible, however, that defendant will prevail at a later time if he can demonstrate compliance with the congressional mandate.

■ Apart from the possibility of BHA compliance, and even though the Court agrees that a person in plaintiff's purported position had a right to a housing preference, the Court is unable to grant plaintiff's motion for summary judgment because there are issues of material fact in genuine dispute, namely, whether plaintiff was in the position she claims she was in and, if so, whether she clearly indicated her situation in the application to the BHA. Specifically, it is not clear whether plaintiff in her January 1986 application applied for housing for herself and her child Lisa or only for herself.

As already noted, the copy of the January 1986 application submitted to the Court lists plaintiff's daughters Lisa and Amanda as persons who would reside with plaintiff in the public housing. Under the heading "Family Composition," plaintiff's name is listed on line 1. Line 2 contains the crossed-out name of "Amanda Pruticka." On line 3 is Lisa's name, followed by Amanda's name again on line 4 (this time not crossed out). Amanda was not born until January 7, 1988. Pruticka conceded at her deposition that she must have added Amanda's name after the filing of the January 1986 application. However, the application reveals another, more significant gap in plaintiff's case. The initial (crossed-out) listing of Amanda's name on line 2 appears above the listing of Lisa's name on line 3. Defendant thus argues that Lisa's name could not possibly have been on the application as it was submitted on January 4, 1986. It does not take a Columbo to concur with this deduction. In further support of his argument that Lisa was not originally on the application of January 4, 1986, defendant has submitted the affidavit of Tricia Christie, a BHA employee. Christie avers that in April 1988, when plaintiff came to the BHA office to file a Section 8 Existing Housing Rental Subsidy Application, she asked that the names of *both* her daughters be added to the January 4, 1986 application. Possibly in recognition of the factual problem with her case, plaintiff at her deposition denied that the January 4, 1986 application is her first application; she claimed that she submitted an earlier application, which the BHA allegedly lost, on which she purportedly listed herself and her daughter Lisa. Pruticka Deposition, at 36–38, 71–73, 78.

The above discussion indicates that there is a genuine dispute as to the issue of whether plaintiff's initial housing application to the BHA was for herself and Lisa or only for herself. This issue is material because plaintiff would have been entitled to a housing preference only in the former situation, not in the latter. Indeed, if plaintiff was applying for housing for herself only, she would not even have been eligible for subsidized housing at all, let alone a preference. *See* 24 C.F.R. § 912.3(a).

There are also disputed factual issues as to whether and when plaintiff had custody of her daughter Lisa. Plaintiff concedes that she did not have custody of Lisa for most of the period in issue, but she asserts that she regained custody of Lisa for a short time after obtaining an order from an unnamed judge who was allegedly awoken from nocturnal bliss; this elusive order was not produced in discovery. Even if she didn't have custody of Lisa, plaintiff argues, she could have obtained such custody had she been able to secure housing from defendant's agency. Whether plaintiff's alternative theory is real or imagined must be determined by the trier of fact. There is also a legal issue, which the Court need not now address, as to whether a housing preference would be available to an applicant whose only "dependent" is a child who is actually in the custody of the applicant's spouse and over whom the applicant merely *seeks to obtain* custody.

## II. *Plaintiff's Rights Under the Due Process Clause*

As an alternative theory, plaintiff alleges that the BHA's own tenant selection criteria, enacted pursuant to the Housing Act and 24 C.F.R. § 960.204, gave her a property right in a housing preference. In support of this theory plaintiff cites the deposition of defendant himself. Posner Deposition, at 15. Plaintiff goes on to allege that defendant's failure to give plaintiff a hearing before rejecting plaintiff's application constituted a deprivation of that property right without due process of law in violation of the Fourteenth Amendment.

The Court finds the record inconclusive on the issue of whether plaintiff was entitled to a preference under the BHA's own guidelines. Accordingly, the Court will deny the cross-motions for summary judgment on plaintiff's due process count as well.

## III. *Whether Defendant Is Immune From Suit Under § 1983*

Defendant further argues that he is immune from suit under § 1983 by virtue of the New Jersey Tort Claims Act, N.J. S.A. § 59:1–1 *et seq.* This argument is frivolous and does not merit more than passing discussion. Suffice it to say that defendant's view of the law stands the purpose of § 1983 on its head: one can only imagine certain state legislatures convening shortly after enactment of the Civil Rights Act of 1871 (commonly known as the Ku Klux Klan Act), now codified as § 1983, to enact laws purporting to confer immunity on state officials for violations of federally guaranteed rights. To the extent that § 1983 and the New Jersey Tort Claims Act conflict, the latter must obviously yield to the former under the Supremacy Clause, U.S. Const. art. VI. This result does not change, contrary to defendant's assertions at oral argument, when the property right that plaintiff seeks to vindicate under the Due Process Clause was created by state law; indeed, the vast majority of property rights are created by or protected by state law in the first instance. Rather, a person has a federal right, protected by the Due Process Clause, not to be deprived of *any* property without due process of law. Finally, plaintiff's invocation of the doctrine of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), is entirely misplaced in that the *Erie* rule applies only to cases in which the federal court's jurisdiction is founded on diversity of citizenship, and not cases arising under federal statutes such as § 1983.

## CONCLUSION

The Court will deny the cross-motions for summary judgment.